R. L. AUTREY and A. L. Goad, Individually and d/b/a Autrey and Goad Construction Company

v.

WILLIAMS & DUNLAP, a Partnership, et al.

H. E. LUTHER

v.

WILLIAMS & DUNLAP, a Partnership, et al.

UNITED STATES of America for the Use and Benefit of C. L. CONNER and Joe A. Brownfield

v.

WILLIAMS AND DUNLAP CONSTRUCTION COMPANY, Inc., et al.

Charles H. McKERREGHAN

v.

WILLIAMS & DUNLAP, a Partnership, et al.

UNITED STATES of America for the Use and Benefit of **UNITED INSULATION COMPANY, Inc.**

v.

**WILLIAMS & DUNLAP, a Partnership, et al.**

UNITED STATES of America for the Use and Benefit of **B. M. JINKS, d/b/a Jinks Construction Company and B. M. Jinks, d/b/a Jinks Construction Company**

v.

**WILLIAMS & DUNLAP, a Partnership, et al.**

UNITED STATES of America for the Use and Benefit of **P. L. FEARS, d/b/a P. L. Fears Tile Company and P. L. Fears, d/b/a P. L. Fears Tile Company, Individually**

v.

**WILLIAMS & DUNLAP, a Partnership, et al.**

Civ. A. Nos. 7228, 7233, 7235, 7462, 7542, 7627, 7628.

United States District Court
W. D. Louisiana,
Alexandria Division.

June 28, 1962.

See also 185 F.Supp. 802.

494

DeWitt T. Methvin, Jr., Alexandria, La., James L. Mitchell, Dallas, Tex., W.

M. Taylor, Jr., Dallas, Tex., John B. McNamara, Jr., Waco, Tex., for plaintiffs.

Camille F. Gravel, Jr., Alexandria, La., John L. Pitts, Alexandria, La., for defendants.

W. Ray Bradford, Alexandria, La., for intervenor.

HUNTER, District Judge.

### PREFACE

Plaintiff in each case is a subcontractor who had entered into a written contract with Williams & Dunlap Construction Company, Inc., to perform portions of the work incident to the construction of the England Air Force Base Housing Project located at Alexandria, Louisiana.

Defendants in each case are:

(1) Williams & Dunlap Construction Company, Inc., a corporation duly and legally organized and existing under and by virtue of the laws of the State of Texas;

(2) Williams & Dunlap, a partnership, a legal entity formed, created, established, and existing under the laws of the State of Louisiana, which is a partnership composed of H. E. Williams, Jr., a citizen of the state of Texas, and B. F. Dunlap, a citizen of the State of Texas;

(3) St. Paul Fire and Marine Insurance Company, a corporation organized and existing under and by virtue of the laws of the State of Minnesota and qualified to do business in the State of Louisiana.

For the purposes of these suits defendants do not urge any technical distinction between the corporation and the partnership of Williams & Dunlap, and by the consent of all, the corporation, the partnership and the individuals as members thereof are considered one and the same. St. Paul is the surety on Williams & Dunlap's bond given under the Capehart Act (42 U.S.C.A. § 1594) to secure payments for all labor and material furnished in the construction of the project. The bond is in the amount of $4,774,200.

At the time of trial there was some disagreement and uncertainty in the few federal cases on the subject as to whether the payment bond, approved as required by the Capehart Act, comes within the Miller Act, 40 U.S.C.A. § 270a et seq., where as here the United States is not named the sole obligee. We held, in Autrey & Goad v. Williams & Dunlap, D.C., 185 F.Supp. 802, that the Miller and Capehart Acts are in pari materia and that the intent of Congress was to require but one such bond for military personnel housing projects, subject to the approval of that bond by the Secretary of Defense or his designee. Subsequently, the Fifth Circuit, in Lasley et al v. United States for Use of Westerman, 285 F.2d 98, agreed that an action by a subcontractor against the prime contractor on a Capehart bond was subject to the provisions of the Miller Act.

We find that the district courts of the United States have original jurisdiction of suits brought by a subcontractor against a prime contractor and his surety for labor done and materials furnished on a Capehart government contract without the necessity for diversity of citizenship. Jurisdiction also exists under the provisions of 28 U.S.C.A. § 1352.[1]

The cases were tried to the court and consumed thirty actual trial days. The transcript consists of 4,782 pages. The record contains thousands of exhibits. We will not attempt a consolidated statement of the cases inasmuch as each case differs from the other factually. The parties in general do not contest the legal principles advanced by each other. Instead, each insists that the legal principles advanced by the other are completely without application under the existing facts. We have never encountered a case where factual disagreement is so complete. Exhaustive briefs have been filed. Each accuses the other of arguing factual conclusions for which there is no support in the record. Illustrative

---

1. 28 U.S.C.A. § 1352: "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States."

is this quote from the opening paragraph of plaintiffs' reply brief:

"In reading the brief filed by the defendants, plaintiffs are certain that the court was impressed with its utter disregard of the record of evidence in this case. The court will note the spurious arguments, virgin testimony, and unfounded statements having no support in the record."

"The Court will also recognize the difficulty in answering a brief prepared with no regard for the record * * *."

Counsel for defendants, in their strong advocacy, make these typical observations:

"Arguments and claims made by plaintiffs in their briefs can easily be demonstrated to be inaccurate and in most instances at variance with the credible testimony of witnesses * * *."

"Plaintiffs in brief say that Autrey testified * * *. Plaintiffs fail to state that where this alleged testimony appears. This is not what Autrey testified to."

"Plaintiffs state that it is undisputed in the record that they had been paid a total of $264,792 for both extras and contract. This is not true."

"Plaintiffs state the record is full of testimony of defendants that most of this completion cost was brought about by arbitrary and unreasonable requirements of the government. Plaintiffs cite pages 3333 and 3346–3455. First, the testimony cited on page 3333 is not on this subject at all."

"Plaintiff resorts to an inaccurate statement as to what is shown in the record; that is, that Mr. Goad put the tile work in the Fleur de Lis Motel, in Mr. Downs' house, and Webb Air Force Base for Henry E. Williams and B. P. Dunlap. Plaintiffs again conveniently fail to cite

where such alleged facts appear in the record."

"Plaintiff states that the draw for January 14, 1958 shows carpentry complete except for $8,000 and that it is approved by Captain Peterson. This is not true."

"We do make this observation as to plaintiff's brief: through the entire discussion of the alleged failure to prepare the site, not one single reference to any testimony or evidence is given; it consists only of conclusions as to what is supposed to be in the record."

It is apparent that the six or seven lawyers who have lived with this case cannot even agree as to what the record and documents say. The task this case presents to the Court and counsel is appreciated.

Before taking up the cases individually we will relate pertinent provisions of the prime contract and the subcontracts.

## HOUSING CONTRACT

The prime contract is found in the record as Exhibit P–1 and Exhibit D–1.1. It contemplates the construction of 202 buildings, 303 building units, at England Air Force Base, Alexandria, Louisiana. The project is identified as FHA Project No. 059–81002 Air 1.

As a prerequisite to the award of the contract, Williams & Dunlap formed a partnership and caused to be organized a corporation (England Air Force Base Housing, Inc.). Williams & Dunlap secured a mortgage loan agreement between England Air Force Base Housing, Inc. and the First National Bank of Dallas, Texas under which the construction of the project was to be financed.

The contract is between the United States, represented by the "Contracting Officer", Williams & Dunlap, and England Air Force Base Housing, Inc. Williams & Dunlap is referred to in the housing contract as "eligible builder." England Air Force Base Housing, Inc., is referred to as "mortgagor builder" and "owner." The government is referred to as

"Department." The First National Bank is referred to as "mortgagee builder."

The contract includes many provisions and we relate here to only a few which the parties deem of particular import.

Article II(3) provides that the units will be constructed to the satisfaction of the owner and the contracting officer.

Article III(4) provides that the owner shall pay to the eligible builder for performance under the contract the total of $4,774,200.

Article IV deals with advances of money under the contract and provides that the eligible builder should submit applications for payment on FHA Form 2448 on or before the first day of each month to be processed by the mortgagor builder (owner) to mortgagee (First National Bank) subject to approval of the contracting officer.

Article V provides that the eligible builder finance the construction under its building and loan agreement with the First National Bank of Dallas.

Article XXI provides that the eligible builder (Williams & Dunlap) pay all expenses, all obligations and guarantee the discharge of all the duties of the mortgagor builder (England Air Force Base Housing, Inc.).

Article XIV provides for the submission of progress draws upon the approval of the contracting officer. These draws, as a practical matter, had to go the following route: First, to the contracting officer; then to the architect-engineer; then back to the contracting officer; then to the First National Bank in Dallas; then to the Federal Housing Commissioner in Shreveport, and then by him back to the bank. Then, and only then, did Williams & Dunlap get its money.

### SUBCONTRACT

After the execution of the housing contract, Williams & Dunlap entered into various subcontracts for the performance of the work it was obligated to do. Among these subcontracts are the seven subcontracts involved in this litigation.[2] These subcontracts were all prepared by Williams & Dunlap, and were mimeographed copies of standard subcontracts used by Williams & Dunlap in subbing out the work. Except for the description of the work to be performed by the individual subcontractors, the subcontracts are identical. All provide for payments in monthly installments based on schedules agreed upon between Williams & Dunlap and the subcontractor.

Article I of each contract provides that in case of any conflict between the provisions of the subcontract and the provisions of the housing contract, the provisions of the subcontract will control.

Article II reads as follows:

"It is intended that this contract cover all phases of the work as referred to in the plans and specifications; however, if any work has not been covered by the plans and specifications or this contract that relate directly or indirectly to this phase of the work, it shall be the responsibility of this Contractor to carry out any and all labor and material to conclude every phase of this hereinabove referred to work. There shall be no extras in any form presented to Williams and Dunlap Construction Company, Inc. Contractor shall be governed by the instructions of the Architect, the Engineer, the Contracting Officer and the U. S. Air Force to the same extent insofar as the same relates to work covered hereby as Williams and Dunlap Construction Company, Inc. is governed and the Contractor is obligated to follow such instructions and shall do so without delay. Any disputes between Contractors shall be arbitrated between Contractors involved and Williams and Dunlap Construction Company, Inc. and any decision reached by Williams and Dunlap Construction Company, Inc. shall be final."

---

2. Only a minority of the subs are involved in this controversy.

Article VI reads:

*"The Contractor shall be bound to Williams and Dunlap Construction Company, Inc. for all the terms and provisions of the housing contract and of the general and special conditions of the specifications* in the same manner that Williams and Dunlap Construction Company, Inc. is bound to the Owner, with like force and effect and in all respects as if the same were set out in full herein and attached hereto. (Italics ours.)

"If the Contractor varies without written authority from the plans and specifications, drawings and detail, Williams and Dunlap Construction Company, Inc. shall have the right and power at all times to order the work objected to removed or replaced, or to receive from the Contractor in payment, a sum of money equivalent to the difference in value of the work performed and that required by the plans and specifications, drawings and details, it being at the option of Williams and Dunlap Construction Company, Inc. to take either course."

Article VII reads:

"The Contractor shall effectually secure and protect its work and shall bear and be liable for all loss or damage of any kind which may happen to the work or any materials to be incorporated therein at any time prior to the final completion and acceptance thereof.

"Williams and Dunlap Construction Company, Inc., shall not be responsible for any damage done to the work or property of the Contractor, unless such damage shall be caused by the direct negligence of Williams and Dunlap Construction Company, Inc."

Article VIII reads:

*"The Contractor shall, at its own cost, amend and make good any defects in its work, which may appear within twelve months after the completion of its contract.* Should the Contractor refuse or neglect to amend and make good such defects within a reasonable time after receiving notice to do so, then Williams and Dunlap Construction Company, Inc. shall have the right and power to make good such defective work at the expense of the Contractor." (Italics ours.)

Article XI reads:

"The progress and completion of the work, including all changes which may be made in accordance with the above provisions, shall be conducted with all possible dispatch. The Contractor waives the requirement of a written notice and agrees to note the progress of this work, so that it shall know when it is possible to begin the installation of its work and shall have all of its materials to be incorporated, designed, purchased, manufactured, assembled and ready for installation whenever the condition of the building shall permit of such installation.

"The Contractor shall, when requested so to do, furnish proof satisfactory to Williams and Dunlap Construction Company, Inc. that all preliminary arrangements of the Contractor have been made or entered into to enable the Contractor to promptly begin the work contracted for herein.

"It is understood that it is not incumbent upon the Williams and Dunlap Construction Company, Inc. to notify the Contractor when to begin, when to cease, or when to resume work, and all materials and all labor shall be furnished at such time as shall be for the best interest of all contractors concerned to the end that the combined work of all may properly and fully complete on contract time, time being the essence of this contract."

Article XII reads in pertinent part as follows:

" * * * Payments to be made in monthly installments of 90 per cent of the value of the work completed in

the building, leaving a balance of 10 per cent of the value of the completed work at all times unpaid, which balance shall be *paid upon acceptance of the work of Williams and Dunlap Construction Company, Inc. by the Owner * * *.*" (Italics ours.)

Article XIII reads:

"The Contractor shall file its schedule of completed work with Williams and Dunlap Construction Company, Inc. before the last day of each month, and payment on such schedule, *provided same shall be found to be correct by Williams and Dunlap Construction Company*, Inc. shall be due on or about the fifteenth of each month. (Italics ours.)

Article XIV reads:

"Before making the above payments, Williams and Dunlap Construction Company, Inc. reserves to themselves the right to demand and receive duly receipted bills for all materials and labor in any way entering into this work, and written releases from all parties having claims against the work."

Article XV reads:

"If at any time there shall be evidence of any lien or claim for which, it is established, Williams and Dunlap Construction Company, Inc. or Owner, or property of the Owner or the improvements, might become liable and which is chargeable to the Contractor, Williams and Dunlap Construction Company, Inc. shall have the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify both or either of them against any claims or liens."

Article XVII reads:

"No partial payment made for work under this contract shall be conclusive evidence of the performance, either wholly or in part, of this contract, and the final payment shall not be construed to mean an acceptance of defective work or improper materials."

Article XXIII reads:

"In the event, during the progress of this contract, any strike or boycott or other interference or stoppage of work occurs on the project which is attributable to Contractor, or his employment practices or his relationship with his employees, or to the fact that such employees do or do not belong to a labor union, *or to the fact that Contractor is not following any rules or regulations* relating to labor, then and upon such occurrence which by reason of such a cause attributable to Contractor, Williams and Dunlap Construction Company, Inc. shall upon giving 48 hours notice have the option and privilege to remove such cause and correct such situation and if required, to remove Contractor from the Project and to complete such work on the basis of current market prices as to labor, materials, and equipment, charging such completion costs against the Contract, and hold Contractor and the surety liable for any loss incurred in such connection." (Italics ours.)

Article XXIV reads:

*"Should the Contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen or material of proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of the agreements herein contained, the Williams and Dunlap Construction Company shall be at liberty, after 48 hours written notice to the Contractor, to provide any such labor or materials and to deduct the cost thereof from any money then due, or thereafter to become due to the Contractor under this contract.* This also gives Williams and Dunlap Construction Company, Inc. the use and possession of all materials, tools and appliances thereon, in the finishing out of the work to be done by the

Contractor. Further, if the Contractor's foreman or employees shall refuse or neglect to comply with the requirements of the contract, or if they shall be riotous, disrespectful, intemperate, disorderly or otherwise objectionable to Williams and Dunlap Construction Company, Inc. he shall forthwith be discharged by the Contractor and shall not be again employed on any portion of the work. The Contractor shall be liable for any and all employees employed by him." (Italics ours.)

It is appropriate in this preface to note some of the legal principles which should guide the Court and also to make findings of fact that are applicable to all cases.

All agree: (1) that the rights and liabilities of the parties under the contracts as to all issues not involving the interpretation or coverage of the Miller Act itself are governed by the law of the State of Louisiana; (2) that the subcontractors had the obligation to complete the work called for in their respective subcontracts in accordance with the plans and specifications and in good and workmanlike manner; (3) that the prime contractor had the duty to prepare the site to receive the work of the subcontractor; to properly coordinate the work of the various subcontractors; to provide competent and adequate supervision of the overall project; to furnish materials necessary in sufficient quantities and to schedule deliveries so as to enable the subs to proceed with their work in an orderly manner.

■ There is disagreement as to the meaning of Article XIII of the subcontract concerning progress payments:

"ARTICLE XIII. The Contractor shall file its schedule of completed work with Williams and Dunlap Construction Company, Inc. before the last day of each month, and payment on such schedule, provided same shall be found to be correct by Williams and Dunlap Construction Company, Inc. shall be due on or about the fifteenth of each month."

Defendants' position is that progress payments were due the subs only when the various trade payment units were performed in a good and workmanlike manner, such as would reasonably be approved and accepted by the government inspectors and when the actual draws were approved by the Air Force and F.H.A. Plaintiffs' position is that they were to file their schedule of completed work with Williams and Dunlap before the last day of each month and that unless Williams and Dunlap made objections prior thereto the payments should be forthcoming *on or about the 15th day of each month*. We are in accord with neither. The provision means precisely what it says:

"* * * *and payment on such schedule, provided same shall be found to be correct* by Williams and Dunlap Construction Company, Inc. shall be due on or about the fifteenth day of each month."

Our construction is that silence on the part of Williams and Dunlap is not to be interpreted as a finding of correctness. Affirmative approval was required. Of course, if there were no deficiencies there would be an obligation to act.

■ Plaintiffs' charge that Williams and Dunlap breached the various subcontracts and damaged them by:

(a) Failing to prepare the site to receive the sub's work.

(b) Failing to coordinate the work of the various subs.

(c) Failing to provide competent and adequate supervision of the overall project.

(d) Failing to furnish materials in sufficient quantities and at appropriate times.

The evidence on this phase of these cases is bitterly disputed and cannot be reconciled. There was mud, inconvenience, bickering—but the record is such that I have no way of telling with any degree of reliability how much, if any, actual damage was sustained as a result. No serious protest (except by Jinks) was made at the time of these alleged incidents of breach. All parties rocked along until

the government inspectors began to tighten up on approval requirements. Then the cash ceased to flow and pandemonium now reigned. In each case except Jinks (Civil Action No. 7627) we find as a fact that the plaintiffs have not proven the fact that Williams and Dunlap breached the contracts in particulars (a), (b), (c) and (d) aforesaid.

## ATTORNEYS' FEES

The recovery of interest, costs and attorneys' fees is governed by the law of Louisiana (Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Caldwell Foundry & Machine Company, Inc., etc. v. Texas Const. Company, 5 Cir., 237 F.2d 705. Two Louisiana statutes are to be considered. The first is LSA–R.S. 9:3902, which reads:

"If the surety on a bond fails to pay his obligation and it becomes necessary for the creditor to sue thereon, the latter shall be entitled to ten per cent attorney's fees on the amount recovered, provided he has employed an attorney for the purpose, has made written amicable demand on the principal and surety and thirty days have elapsed from their receipt thereof without payment being made, and the full amount claimed in the demand is recovered."

This statute is not controlling because we have not allowed any plaintiff "the full amount claimed in the demand * * *". (Kozlowski v. Fowler, La.App., 71 So.2d 246). The second is LSA–R.S. 22:658:

"All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees."

This is applicable only when failure to pay is found to be arbitrary, capricious, or without probable cause. We find that except in United Installation, Civil Action No. 7542, the failure to pay was not capricious, was not arbitrary and was not without probable cause.

We proceed to the individual cases.

### CIVIL ACTION NO. 7228
### R. L. AUTREY AND A. L. GOAD, INDIVIDUALLY AND d/b/a AUTREY AND GOAD CONSTRUCTION COMPANY
### V.
### WILLIAMS & DUNLAP, A PARTNERSHIP, ET Al.

Autrey and Goad were the carpentry subcontractors. There was no other carpentry contract at any time. The subject contract appears in the record as Exhibit P.–2 and Exhibit D–2.4.

Under the terms and conditions of the Autrey and Goad subcontract, Williams and Dunlap agreed to pay to Autrey and Goad the total sum of $398,440.50. Attached to and made a part of the contract was a breakdown schedule for payments.

This trade payment breakdown broke the carpentry phase of the work into items, and it was agreed that Autrey and Goad would be paid specified amounts as set out in the contract for each item of completion. This progress draw schedule was simply a devise to permit the subcontractors to draw against the completion of the entire contract, and if the work included in progress payments was subsequently found deficient, the contractor was not foreclosed from requiring correction simply because this work had been listed in the progress payments. This is spelled out in Article XVII of the subcontract which is quoted in the preface hereto.

Later, certain extras were authorized in the amount of $5,565.50 so that the total amounted to $404,006.

Autrey and Goad came to Alexandria, Louisiana on or about the 14th day of April, 1957 for the purpose of commencing the performance of the work. They continued to work in the performance of their contract until December 20, 1957 (D–71.39). On that date they reduced their work force to five (5) men and demanded payment of allegedly past due draws. On December 30th Williams and Dunlap invoked Article XXIV of the subcontract alleging that the job was not being properly manned (D–71.24). The position of Autrey and Goad is that they were "run off the job." Autrey and Goad say that Williams and Dunlap breached its contract by:

(a) Failing to prepare a site to receive the work of the subcontractor.

(b) Failing to furnish coordination of the project to facilitate the work of the subcontractor.

(c) Failing to supervise the work to facilitate the orderly procedure and progress of the job.

But they concede that regardless of this, they continued performance until the contract was wrongfully terminated.

Considering the whole record, we reiterate that plaintiff has not proven that Williams and Dunlap breached its contract in any of these particulars.

What about progress payments? Defendant's position is that progress payments were due the subcontractors only when the various trade payment units were performed in a good and workmanlike manner such as would be reasonably approved and accepted by the government inspectors, and further, that the draws were not actually due until the work was approved for payment by the Air Force and the FHA. Plaintiff, on the other hand, insists that it is entitled to have the contractor make these payments in strict compliance with their interpretation of Article XIII of the subcontract, which is to the effect that Autrey and Goad would file its schedule of completed work with Williams and Dunlap before the last day of each month, and that payment on such schedule, provided no errors are pointed out by Williams and Dunlap, should be due on the 15th of each month. We disagree with both parties and reiterate what we said in the preface, speaking of Article XIII:

> The provision means precisely what it says: "payment on such schedule *provided same shall be found to be correct by Williams and Dunlap* shall be due *on or about* the fifteenth day of each month." Silence on the part of Williams and Dunlap is not to be interpreted as a finding of correctness. Affirmative approval was required.

Now, let us examine the record. The first draw was submitted on May 31, 1957; it was found to be correct and was paid on June 13, 1957. The second draw was submitted on June 29th, found to be correct, and paid on July 18th. The third draw was submitted on July 31st, found to be correct, and paid on August 13th. At this stage of construction, the work was proceeding well and everybody seemed happy. No one at this stage of the game was complaining too much about the mud, lack of materials, deficiencies, inconveniences, etc. The real trouble was to come.

The fourth draw was submitted on August 31st.[3] It was approved by Williams and Dunlap and was not paid until September 25th. This delay was necessary to permit Autrey and Goad to secure a release from its bonding company on an assignment that it had made to the Guaranty Bank of Alexandria. Autrey and Goad's fifth draw, submitted September 30th, was found correct by Williams and Dunlap, but was not approved by the FHA in Shreveport until October 22nd, and payment was not made until October 25th. There had been some delay in making these last two payments, but no one was very angry yet. Then the Air Force began to tighten up on approval requirements, noting through various letters which appear in the record that too many deficiencies were being carried forward without correction. The position of the Air Force was set forth in Captain Peterson's letter of September 24, 1957 (D–7.-20). This letter is important to show really what happened here. It reads:

"24 September 1957"

"Williams & Dunlap
England AFB Housing, Inc.
England Air Force Base, La."

"Dear Mr. Williams:

"Your attention is invited to the provisions of Clause 6 to the General Provisions of the Housing Contract which outlined specifically that defective materials and workmanship must be corrected without delay.

"I am aware that you have been notified on numerous occasions that faulty workmanship and materials have been allowed to remain uncorrected even after repeated notification by the architect engineer inspectors of this fact. I have instructed the chief inspector to require that all workmanship and material comply with all provisions of the drawings and specifications. The air force will insist that all workmanship be satisfactorily corrected and all rejected materials shall be satisfactorily replaced with proper material well in advance of our proposed acceptance inspection.

"Request you give this matter your personal attention inasmuch as work on certain units has progressed to the final stages of construction and should soon be ready for final acceptance by the Air Force. The Air Force will not accept any material, installation, and workmanship which is not satisfactory to the architect inspector and in compliance with the housing plans and specifications. In general the workmanship of all mechanics working on the project could be improved upon with particular emphasis on wallboard installation, interior trim, and kitchen cabinet installation."

"Yours truly,

s/ Max D. Peterson
Max D. Peterson
Captain, USAF
Procurement Officer."

Again, on October 14, 1957, Captain Peterson wrote Williams and Dunlap, emphasizing again what was said in the letter of September 24th:

"14 October 1957

"Williams & Dunlap
England AFB Housing, Inc.,
England Air Force Base, La."

"Dear Mr. Williams:"

"A legal interpretation of Clause 6 "Inspection" and Article IV "Payments from Mortgage Proceeds" of the Housing contract has been made by Headquarters, Tactical Air Command. The Air Force may not approve any item in the applicable trade payment breakdown for which an application for advance payment has been requested if any rejected workmanship or material has not been satisfactorily replaced or repaired within a reasonable time.

"The inspection clause clearly indicates that these rejected portions must be cor-

---

**3.** Article XIII required Autrey and Goad to file its schedule *before* the last day of the month.

rected at once. However, it will be the responsibility of the contracting officer to determine the reasonable length of time that has been allowed after notification of the defect before it will be cause for exclusion from the request for advance payment from mortgage proceeds.

"Your attention is invited to the possibility that a major portion of an advance payment request could be disapproved depending on the uncorrected deficiencies for each item of the trade payment breakdown.

"Yours truly,

s/ Max D. Peterson
Max D. Peterson
Captain, USAF
Procurement Officer"

On November 15th Williams and Dunlap wrote all subcontractors a registered letter (D–7.18):

"November 15, 1957"

"All Subcontractors
Capehard Housing Project
England AFB, Louisiana."

"Gentlemen:

"We are attaching herewith a copy of letter received from Base Procurement Officer, which quotes from a letter received on October 8, 1957 from Frederick T. Aneitta, Col. USAF, Dep. Director of Installation. For your information our draw was almost disapproved this month due to the lack of completing deficiencies as reported. For example, Williams, Dunlap and Young was to be penalized $51,000.00 and the brick work approximately $40,000.00.

"What the attached letter says is that all phases of work (such as carpentry, plumbing, painting, insulation, electrical, utilities, etc.) shall be turned down in its entirety if one or more deficiency reported by the inspectors is not corrected.

"In view of this, and to insure our monthly draw, we guaranteed the Air Force that all deficiencies reported shall be started to correct within 48 hours of receipt of the deficiency report and shall not cease until completion, no excuse accepted except for weather. This problem of deficiencies has reached an acute stage and it was suggested that the drastic action of withholding all monthly draw requests on all of the items (such as plumbing, electrical, etc.) be enforced until such deficiencies were met and completely finished to the full satisfaction of the inspector.

"We have been advised by Captain Peterson that the inspectors have the authority and responsibility to dictate and interpret the plans and specifications together with the process of ways of doing the job to the satisfaction and best interest of the Air Force and the contractor.

"To sum it up, our draw will not be approved unless deficiencies, have been corrected. In acccordance with the attached letter the Air Force has the authority to withhold approving certain phases of work, if one or more deficiencies warrants this action. Therefore, as mentioned above all deficiencies shall be started to correct within 48 hours after receipt thereof."

"Yours truly,

WILLIAMS AND DUNLAP
CNST. CO., INC.
s/ H. E. Williams, Jr.
H. E. Williams, Jr.

Autrey and Goad's sixth draw was submitted on October 31st in the amount of $78,360. It was approved by Williams and Dunlap and under the subcontract should have been paid on or about November 15th. FHA approval was received on or about November 25th. In the interval and before FHA approval, Goad was advanced $18,500. Williams and Dunlap made a unilateral decision that $7,000 should be deducted from the balance due because of their conclusion that Autrey and Goad had failed to nail up certain cornice material and sheathing shown by field check not to be in place. Mr. Autrey refused to accept the check in the reduced amount. However, subsequently on November 27th

Williams and Dunlap mailed to the Guaranty Bank a check in the amount of $52,814 to be paid on Autrey and Goad's account. The Court feels that under Article XIII, Williams and Dunlap, once having found the $78,360 to be correct, was obligated to pay it in full on or about November 15th.

The seventh draw was submitted on November 30, 1957 for $29,522 and if found correct by Williams and Dunlap should have been paid on or about December 15th. It was not acted upon by Williams and Dunlap. It was not paid at all. Basically, it is the November draw which brought about the termination of this contract between the parties. Williams and Dunlap's given reason at the trial for not paying the seventh draw was that through November Autrey and Goad had been paid all they were entitled to by simple arithmetic. Mr. Grossman testified (Tr. 3250–51):

"THE COURT: Where did they stand, then, in the percentage of completion as compared to what they had been paid for?

"THE WITNESS: When we finally received approval of the November work, they had 73.4% of their total work approved. They had already been paid 73.8%."

Because they were out of funds and unable to meet their payroll, Autrey and Goad reduced their force until they had only five men on the job, and then on December 20th they formally notified Williams and Dunlap that they would do no further progress work "until such time as this subcontractor has been paid its November estimate, which estimate was due on about the 15th day of December." (D–71.39.) On December 27th Williams and Dunlap wrote to Autrey and Goad advising them that they were not manning the job, and that they were going to man the job with their own personnel beginning Monday, December 30th and were invoking Article XXIV of the contract (D–71.24). This letter was answered on December 28, 1957 by Mr. Methvin and he advised Williams and Dunlap that if they placed any men on

the job it would have to be so at Williams and Dunlap's own expense. Also, Mr. Methvin told Williams and Dunlap that Autrey and Goad would continue to maintain personnel on the job to accept payments and to correct any defects in its work, and that Autrey and Goad was ready, willing and able to complete its contract if and when Williams and Dunlap brought its obligations to a current status (D–71.17).

Williams and Dunlap proceeded to take over the carpentry contract. Autrey and Goad made demand for the balance allegedly due under the subcontract ($137,-416.39). Subsequently suit was filed and plaintiff seeks judgment for $312,000. Williams and Dunlap claims that it spent some $157,000 to complete.

As of December 31, 1957 the subcontract between the parties had been terminated and we find that fault was mutual and that both were guilty of a breach.

Williams and Dunlap was guilty of a breach in not having paid in full and on or about November 15th the full amount of Autrey and Goad's schedule draw which was submitted on October 31st. After having found it correct, they had no right to retain $7,000 therefrom. They were also guilty of fault and negligence in helping to develop the situation where the sub found itself unable to meet its payroll. Autrey and Goad was the originator of the incorrect completion estimates, but Williams and Dunlap was or should have been thoroughly aware of the situation and yet they approved these estimates up until the November 30th one. The November 30th estimate was not approved by Williams and Dunlap in the final analysis they say they did not pay it because nothing was due. This is in truth an admission that they had approved erroneous and incorrect progress completion schedules.

Then, too, we believe Williams and Dunlap was at fault in another particular. This is in relation to the furnishing of materials. We reiterate our conclusion that plaintiffs have not proven a breach or specific damage in this particular, but we do believe that the record on this

subject suffices to show that there was a shortage of siding, windows and cornice materials and that this was one of the reasons for the deficiencies and the incompleteness, and the subsequent failure of FHA to pay timely to Williams and Dunlap, who at the time were saying in effect to Autrey and Goad: "When we get ours, you get yours." We conclude that Article XIII did not require Williams and Dunlap to point out defects or pay the estimate within fifteen days, but in view of what had occurred previously it was only natural that Autrey and Goad would expect the November payment on or about the 15th of December. By waiting until mid-December to call attention to the deficiencies Williams and Dunlap left Autrey and Goad, to say the least, in a bind.

■ Autrey and Goad breached the subcontract by not properly manning the job after December 15, 1957. They were obligated under Article XXI to proceed under the written orders of Williams and Dunlap to complete the work. Article XXI reads:

"If at any time any controversy shall arise between Williams and Dunlap Construction Company, Inc. and the Contractor with regard to any matter or thing involved in this contract, and which the parties hereto do not promptly adjust and determine, or which the Architect cannot decide to the satisfaction of both parties hereto, then the written orders of Williams and Dunlap Construction Company, Inc. shall be followed and said controversy shall be decided by arbitration at the end of the work, and before final settlement is made between Williams and Dunlap Construction Company, Inc. and the Contractor."

We appreciate that because of financial reasons they were forced to reduce their work force to five men but this is no excuse under the contract. We are impressed by the fact that they had already drawn from the job for non-job expenses some $45,000 (D–63, Tr. 4156–4224). During the short time they were on the job, Mr. Goad drew $11,535 and Mr. Autrey drew $11,263. Each bought a brand new station wagon and then sold it to the partnership. Other expenses charged to the job included (1) $511.61 at the Holiday Inn for social dinners; (2) $799.50 for telephone bill; (3) Penley and Company (clothing store), $523.-95; (4) $313.28 for the Diners' Club— some $200 they say they spent dining government (state) officials (Tr. 4213); (5) $1,015.11 to Selber Bros. (a clothing store in Shreveport).

Having found a mutual breach, we endeavor to ascertain the status of the parties as of December 31, 1957. The total contract price, plus extras, was $404,006. Williams and Dunlap had paid Autrey and Goad $267,414.60. This left a total balance due under the contract of $136,591.-40. We find from the government inspection report (D–5.8), made after Autrey and Goad left the job and from Grossman's testimony and from a compilation of Autrey and Goad's request for payment, and from the daily foreman's reports, that there was carpentry work not done having a draw value of approximately $77,000. Subtracting this amount there would remain a balance due of $59,591.40. From this must be subtracted the amount of $2,941.50 which was paid for Autrey and Goad to others by Williams and Dunlap. This leaves a balance due of $56,649.90.

On December 18th, Autrey and Goad were advised by Williams and Dunlap that as a result of one of the inspections by the Air Force certain deficiencies existed in a particular house and that many of these defects existed in six or eight houses located in the south end. The Air Force had advised Williams and Dunlap that they did not plan to enter each house and make an inspection until Autrey and Goad had corrected the defects in those houses insofar as they might exist. It seems that there were some 17 defects in the first house inspected, which were as follows (D–71.19):

"1. Kitchen cabinet and lavanette doors not installed.

"2. Broom closet and linen closet doors and hardware not installed.

"3. Clothes hanger rods in closets not installed.

"4. Door guides for closet doors (sliding) not installed.

"5. Screens on sliding doors and windows not installed.

"6. Push plates on swinging door installed too low, should be 50″ to center.

"7. Door trim and jambs do not fit floor in many of the doors.

"8. Base boards:
 "a. Split at lint trap.
 "b. Base cut around washer-drain half in wall, not a finished job.
 "c. None to left of kitchen door leading to foyer.
 "d. Split to right of front door.
 "e. Nails not set and puttied throughout bldg.
 "f. None to left of bath # 2 door.
 "g. Does not fit wall to left of sliding door.

"9. Bath # 2: Jamb on shower room opening warped; wall between shower room and bath room not square.

"10. Foyer closet doors not adjusted, drag floor.

"11. Wedges behind jamb of closet, bed room # 3 left ragged and not trimmed out.

"12. Window does not work well in bed room # 3.

"13. Jambs to both bath doors do not fit to tile floor leaving a rodent hole.

"14. Sliding windows not adjusted to keep them from coming out of tract at top in several cases.

"15. Closet shelves not nailed and finished; center support not plumb.

"16. Sheet rock out too large for bed room light fixtures and both exhaust fans.

"17. Outside:
 "a. Nails protrude through roof sheathing, exposed.
 "b. Nails showing, near misses, through rafters in roof overhang.
 "c. Shake siding and top trim not moulded out.
 "d. Wood strips under windows not well fitted especially on front at bed room # 1.
 "e. 2 x 4 screen in front not anchored properly.
 "f. Shake nailing missed nailing strips in areas on front and back; shakes not nailed (brads) at mitered corners.
 "g. Nails piercing nailing strips in storage room should be bent over.
 "h. Some nailing of the Upson boards in car port inadequate.
 "i. Excessive gap under storage room doors.
 "j. Sole plate overhangs foundations approx. 1 inch around storage room.
 "k. Screws left out of right jamb on glass sliding door.
 "l. Screen door to car port warped and screen broken lower panel.
 "m. Shingle shakes not well fitted over kitchen door leaving a rodent hole."

On December 21st they were informed of deficiencies existing in a number of other houses as follows (D–71.20):

1. Door Jambs too short.
2. All doors not fitted tight.
3. Closet shelves not nailed and hanger rod not installed.
4. Wood doors not installed in kitchen and bath as required.
5. Sliding door guides.
6. Base nails not set in base and not good fit to walls.

7. Nails in overhang to be chipped off.
8. Clean up inside and out.
9. Many holes in sheet rock cut too large for elec. fixtures.

House # 148—Above 9 defects.

House # 128—Above 9 defects.

House # 129—Above 9 defects and trim needs replacing in kitchen.

House # 131—Above 9 defects and trim not complete in kitchen and closet and storage door won't close.

House # 132—Above 9 defects.

House # 133—Above 9 defects.

House # 134—Above 9 defects.

House # 136—Above 9 defects.

House # 137—Above 9 defects.

House # 139—Above 9 defects.

House # 150—Above 9 defects.

House # 152—Above 9 defects, and install storage door.

House # 154—Above 9 defects.

House # 155—Above 9 defects.

House # 156—Above 9 defects.

House # 160—Above 9 defects.

House # 162—Above 9 defects and screen door repair.

House # 163—Above 9 defects.

House # 164—Above 9 defects.

The Court is satisfied that in addition to the carpentry work not done that various defects and deficiencies existed on work that had already been done and that it was necessary for Williams and Dunlap to spend a considerable amount of money to correct these deficiencies. Williams and Dunlap have endeavored to prove that they spent $157,000 completing the job, which would mean that in addition to the new work for which we have already credited them ($77,000), corrective work and other chargeable expenses thereto amounted to some $80,000.[4] We will not allow this credit to Williams and Dunlap because we do not believe the proof is sufficient that all of this should have been charged to Autrey and Goad. On February 10, 1958 counsel for Williams and Dunlap, referring to Autrey and Goad's subcontract, advised the Guaranty Bank and Trust Company that "there will be approximately $31,000 left in the contract after payment has been made to the Guaranty Bank, to Thompson and to Clark. An additional $8,000 is estimated as being the amount necessary to complete the work, leaving an estimated balance of *$23,000 * * *.*" (D–71.8.)

We do *not* accept the intimations of outrageous padding, feather bedding, profiteering, etc., but we will not allow Williams and Dunlap credit for the entire amount. We do believe, however, that their proof suffices to permit them credit for the ten per cent retainage that they had possession of out of the payments previously made. This retainage amounted to $29,712.57 (9/10–267,414.6; 1/10–29,712.57). Crediting this amount against the $56,649.90 leaves a balance due Autrey and Goad of $26,937.33.

### CONCLUSION

There should be judgment in favor of R. L. Autrey and A. L. Goad, doing business under the assumed name and style of Autrey and Goad Construction Company, and against defendants, Williams and Dunlap Construction Company, Inc.; Williams and Dunlap, partnership composed of H. E. Williams, Jr. and B. F. Dunlap; and St. Paul Fire and Marine Insurance Company, in solido, in the amount of $26,937.33, together with interest thereon from July 8, 1958 until paid.

Counsel for defendant in his reply brief prays that the Court proceed to take up the matter of its counterclaims

4. We agree with counsel for plaintiff that there is no way for any trier of fact to determine from the record how much of the total $157,000 was attributable to reasonable and necessary expenses of completing the carpentry subcontract as distinguished from what Mr. Grossman refers to as arbitrary and unreasonable requirements of the government, but of course these contracts had to be completed to the satisfaction of the government. Williams and Dunlap have a good claim against the government.

We feel that what has been said here adequately disposes of those claims.

## CIVIL ACTION NO. 7233
## H. E. LUTHER
## V.
## WILLIAMS & DUNLAP, A PARTNERSHIP, ET AL.

H. E. Luther was the subcontractor for the masonry work. His contract appears in the record as P-7. Luther was required to furnish the mortar, wall ties and labor incident to the completion of the masonry work. The brick and holiday stone were to be furnished by others. Payment was to be made on the basis of $59.00 per 1,000 face brick and $118.00 per 1,000 for holiday stone.

Luther began work during the last days of August, 1957. He says that he was run off the job on December 23, 1957. The defendant says that he abandoned the job on that date by refusing to return to work in spite of adequate financial and other arrangements offered him.

Luther claims that Williams and Dunlap breached its contract with Mr. Luther in the following particulars:

(a) In failing to timely make progress payments as called for under the subcontract.

(b) In failing to advance the weekly payrolls as they were obligated to do under the contract.

(c) In failing to furnish materials timely and in quantities necessary to permit Luther to proceed with his work in an ordinary manner.

(d) In ordering Mr. Luther off the job on December 23, 1957.

From the outset, Mr. Luther had no money whatsoever with which to meet his weekly payrolls. These had to be advanced by Williams and Dunlap. He came on this job without money and with debts. His contract provided that he would be paid monthly on or before the 15th day of the month based on items of completion submitted to Williams and Dunlap. His special arrangement (collateral agreement) with Williams and Dunlap provided that he would write his payroll checks at the end of each week, and Williams and Dunlap would give to him a reimbursement check in the amount of Luther's net payroll. This included $200 per week for Luther personally. At the end of the month Williams and Dunlap was to pay Luther the difference between the weekly payrolls made by Williams and Dunlap and the amount due Luther under his progress schedule, less 10 per cent retention. Out of this monthly draw he was to pay all debts incurred on or as a result of this job. The record reveals that Luther never received any of this additional pay—that is, money in addition to his payrolls, because he had failed to pay his own obligations after being notified to bring his accounts current, and as a result of this, direct payments in Luther's behalf had to be made to his creditors. Other amounts were properly retained to allow for clean up and washing down. The record convinces us that Luther had received all that was due him through November 30th and at the time of the termination of this subcontract. However, even allowing to him all the work he claims to have had in place on December 23, 1957, there was still not enough credit to pay the debts incurred. In addition the government had filed a tax lien on Luther (social security withholding, etc.). This lien was served on Williams and Dunlap and in effect bound them not to pay any profit directly to Luther.

■ The Court finds specifically that Williams and Dunlap did not fail to advance the weekly payrolls as they were obligated to do, and that Williams and Dunlap did not fail in its obligation to furnish materials timely and in quantities necessary to permit Mr. Luther to proceed with his work in an orderly manner.

■ The Court does feel that Williams and Dunlap's action in terminating Mr. Luther's employment as of December 23, 1957, was wrongful. The letter

of termination was written on December 20th and reads as follows:

"WILLIAMS & DUNLAP
CONSTRUCTION COMPANY, INC.
P. O. Box 7225
Dallas, Texas

"December 20, 1957

"Gist, Murchison, & Gist
918 Foisy Avenue
Alexandria, Louisiana

"Re: H. E. Luther

"Gentlemen:

"In partial reply to your letter of December 19 addressed attention Mr. D. P. Dunlap, we wish to advise that it is our contention that Mr. Luther does not have enough funds accrued to his account as earned under contract to cover the expenses you have set forth in your letter.

"We further advise it is not our responsibility to pay Mr. Luther's bills but, as required by our contract, it is Mr. Luther's responsibility to present us with paid bills for all labor and material and taxes at any time we might require in order that he might make a draw against his contract.

"We have requested that Mr. Luther present us with these paid bills and consider that if he fails to present us with these paid bills that he has breached his contract, specifically, the provisions of Article 14. If these bills are not presented to us by 9 AM Monday, December 23, we shall consider Mr. Luther's contract breached and shall man the job with men in our own employ charging the cost thereof against Mr. Luther's contract.

"Yours truly,

WILLIAMS AND DUNLAP
CONST. CO., INC.

By: s/ K. D. Grossman, Jr.
K. D. GROSSMAN, JR."

Williams and Dunlap said they terminated the contract because Luther was not paying his bills, but there is nothing therein which would permit Williams and Dunlap to terminate for that reason. The only recourse open to Williams and Dunlap under the subcontract was to retain out of any payment then due, or thereafter to become due, an amount to sufficiently and completely indemnify Williams and Dunlap. Article XIV of the contract reads as follows:

"Before making the above payments, Williams and Dunlap Construction Company, Inc. reserves to themselves the right to demand and receive duly receipted bills for all materials and labor in any way entering into this work and written releases from all parties having claims against the work."

Article XV reads as follows:

"If at any time there shall be evidence of any lien or claim for which, if established, Williams and Dunlap Construction Company, Inc. or Owner, or property of the Owner or the improvements, might become liable and which is chargeable to the Contractor, Williams and Dunlap Construction Company, Inc. shall have the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify both or either of them against any claims or liens."

The Court repeats that under these two provisions, Williams and Dunlap was within its rights in retaining the money, but they had no right to terminate Luther because he was not paying his bills.

Having decided that Williams and Dunlap did unlawfully terminate this contract, we next turn our attention to the question of damages suffered by Luther. The measure of damages for breach of contract is governed by Article 1934 of the LSA–Civil Code.[5] This article sets forth that the amount of damage due

5. "Art. 1934. Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived * * *."

for the breach should be the amount of the loss sustained by the breach and the profit of which one has been deprived.

█ The Court finds that Luther was not making any profit off this job and that he did not sustain any loss by the breach. Williams and Dunlap, Inc., did him a favor by relieving him of a contract upon which he was going deeper in debt all the time. Had they not terminated him for invalid reasons, they could have proceeded under Article XXIV, given the required notice, and had a valid counterclaim. The total contract price was $83,077.63. Luther was paid $41,550.55. $6,975.14 was paid to others on his behalf. Williams and Dunlap contends that it cost them $71,178.73 to complete this work. The cost to Williams and Dunlap, and Luther, of completing this $83,077.63 contract was in excess of $109,000.

Of greater import is the status of the contract as of December 23, 1957:

| | | |
|---|---|---|
| Total claimed—gross adjusted for unauthorized breakage | $55,088.04 | |
| | 5,088.04 | |
| 1st corrected gross claimed adjust for 15% work not performed | 50,000.00 | |
| | 7,500.00 | |
| 2nd corrected gross claimed less 10% retainage | 42,500.00 | |
| | 4,250.00 | |
| corrected net claimed less previous payments | 38,250.00 | |
| | 39,045.33 | Actual* |
| balance | ( 795.33) | overpaid as of 12/19 request |
| paid on Dec. 19 and 20 | 3,663.18 | Actual* |
| balance | (4,458.51) | overpaid as of 12/20 request |
| paid for NSF checks | 1,245.75 | Actual* |
| balance | (5,704.26) | overpaid including all NSF Luther checks paid |
| paid for Luther's accounts due | 5,865.76 | Actual |
| balance | (11,390.02) | overpaid as per plaintiff's corrected claim. |

———◆———

Mr. Luther was losing money. By projection of the itemization above he actually would have lost some $16,500. He did not have this to lose. He did not have this to start with. The truth is that Mr. Luther was in bad financial condition from other jobs when he took this one. For some reason, whether it is underbidding or through his own mis- management (we do not know), this was a losing proposition for Luther.

█ It is true that when a contractor is discharged unlawfully he can, in a suit for damages, recover the profits that he might have made or any damage that he suffered. But here, he suffered no damage because he was losing and would have continued to lose. When

Luther left the job he left behind two pick-up trucks, two mixers, wheelbarrows, scaffold boards, mud boards, scaffold jacks and some miscellaneous equipment. This was all confiscated by Williams and Dunlap. Williams and Dunlap did not properly terminate the contract and was therefore not within its rights in confiscating this equipment. What is the value of the equipment? The only testimony on that subject is by Luther himself. The Court finds that $1,500 would be a fair award for the value of this equipment. Accordingly, there should be judgment in favor of plaintiff and against defendants in the amount of $1,500, with legal interest thereon from date of judicial demand until paid.

On this record the counterclaims would fail. Article VIII is not applicable because the subcontractor had not completed its contract. The termination notice was not for good cause under Article XXIV.

CIVIL ACTION NO. 7235

UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF C. L. CONNER AND JOE A. BROWNFIELD

V.

WILLIAMS AND DUNLAP CONSTRUCTION COMPANY, INC., ET AL.

Conner and Brownfield was the concrete subcontractor. Their contract appears in the record as P-3. They seek to recover their final estimate and for damages allegedly caused by specified acts of Williams and Dunlap. Williams and Dunlap, on the other hand, asserts that plaintiff failed to fully perform its contract by reason of not doing its work in a good and workmanlike manner. Williams and Dunlap insists they expended $37,195.05 to complete this subcontract and that Conner and Brownfield owes them $24,762.85.

We find plaintiff has *not* proven that defendant: (1) failed to make timely progress payments; (2) failed to properly supervise and coordinate the work; (3) failed to timely and adequately furnish materials; (4) failed to provide reasonable and accessible work areas; (5) insisted that Conner and Brownfield keep men and supervisory personnel on the job disproportionate to the sequence and stage of the construction.

Did Conner and Brownfield substantially perform their contract? The question of whether or not there has been substantial performance is a question of fact under the law of Louisiana (Airco Refrigeration Service, Inc. v. Fink, Supreme Court of La., Dec. 11, 1961, 242 La. 73, 134 So.2d 880). Among the facts to be considered are the extent of the defect, the degree to which the purpose of the contract is defeated, the difficulties involved in remedying the defects, and the use or benefit to defendant of the work performed. *We conclude and find as a fact that there was substantial performance of the subcontract by Conner and Brownfield.* Conner and Brownfield are therefore entitled to recover the full contract price (including the agreed to extras), *less* the amount that was necessary to correct deficiencies so as to bring the subcontract performance into exact compliance (Airco Refrigeration Service, Inc. v. Fink, supra; Town & Country Contractors v. Henderson, 231 La. 131, 90 So.2d 863; Canulette & Son v. Clesi, La.App., 39 So.2d 853; Jerry Ice Co. v. Col-Flake Corp., D.C., 174 F.Supp. 21, affirmed 5 Cir., 278 F.2d 508).

Plaintiff does not quarrel with the doctrine of substantial compliance as set out by the Louisiana Courts. But plaintiff does insist that defendant not be permitted any deduction at all for defective work because no notice was given as provided in the contract to him that deficiencies existed which he was required to correct.

Article XXIV (supra) does require a formal 48-hour written notice. Article XXIV is the general default provision and *certainly* is in no way applicable here, where plaintiff asserts its job was complete and we agree at least to

the extent that it was substantially complete. Article VIII of the contract reads:

"The Contractor shall, at its own cost, amend and make good any defects in its work, which may appear within twelve months after the completion of its contract. Should the Contractor refuse or neglect to amend and make good such defects within a reasonable time after receiving notice to do so, then Williams and Dunlap Construction Company, Inc. shall have the right and power to make good such defective work at the expense of the Contractor."

Article VIII does not require written notice. The issue quickly narrows: Did Conner and Brownfield neglect to amend the defects within a reasonable time after receiving notice? Let us look at the record. Conner and Brownfield's final estimate of February 28, 1958 was submitted to Williams and Dunlap on March 15, 1958 (D–4(a–1). Then and there, Grossman, representing Williams and Dunlap, discussed the question of possible deficiencies with Brownfield and told him that specific deficiencies would probably be developed when the final inspections were made. Mr. Brownfield said that he would take care of these when they developed (Tr. 3863, et seq.). On March 26, 1958, Conner and Brownfield's lawyer wrote sub-sub Sam Young's lawyer. Therein it was acknowledged that Conner and Brownfield knew Williams and Dunlap were claiming deficiencies. This letter advised sub-sub Sam Young's lawyer that payment would not be made to Young until the question of these deficiencies had been settled (D–71.36). Sometime between March 26th and April 2nd, Brownfield and Grossman conversed over the telephone and as a result of that conversation Sam Young was sent to correct the deficiencies (Tr. 2328). On April 2, 1958, Williams and Dunlap notified Conner and Brownfield by letter that:

"* * * numerous deficiencies in the concrete work are being corrected daily by the general contractor and charged against your contract.

Strict accounting of this work is being kept and will be available to you any time you desire." (D–71.37).

On June 22, 1958, Conner and Brownfield's lawyer wrote to Sam Young's lawyer that Brownfield had been advised by Dunlap that Young had authorized Williams and Dunlap to correct the deficiencies. This letter reveals that Brownfield had personally observed some 12 to 15 cement finishers occupied in correcting deficiencies existing in Sam Young's work (D–44). On April 18, 1958, Conner and Brownfield's lawyer wrote Conner and Brownfield's bonding company claiming set-offs against Sam Young as a result of:

"* * * improper work by him and due to the fact that Williams and Dunlap, the prime contractor, are performing certain correcting measures to bring this work up to specifications, and have advised Conner and Brownfield that they will backcharge him for the expense of doing this work." (D–45.)

This letter went on:

"* * * only last week Mr. Brownfield went over this entire matter with Mr. Young at the job site and they discussed the situation with a representative of Williams and Dunlap." (D–45.)

On June 28, 1958, Conner and Brownfield's lawyer wrote Williams and Dunlap asking for a description of the work that they had performed in behalf of Conner and Brownfield (D–46).

This record presents conclusive proof as set forth above that Brownfield *knew* even before April 18, 1958 that Williams and Dunlap was performing certain corrective measures to bring this work up to specifications. D–45 contains an admission that Conner and Brownfield had been specifically advised of this and advised that they were going to be backcharged for it. Then, too, this record reveals that Brownfield did send Sam Young to correct the deficiencies and that Sam Young authorized Wil-

liams and Dunlap to correct the deficiencies. Summing it up, we believe that the exhibits, the subcontractor's statements and actions (such as saying deficiencies would be "taken care of", sending his subcontractor Young to take care of deficiencies, requesting advice as to how much such corrective work was costing him) sufficiently show notice within the meaning of Article VIII. Brownfield sent Young over there to do it. When Young did not do it, Williams and Dunlap did it and everybody knew that Williams and Dunlap was going to do it. Under these conditions, I believe that there was authorization to the prime contractor to make corrections insofar as the work of Sam Young was concerned, and to charge those costs back to the subcontractor, Conner and Brownfield.

What amount, if any, is due Conner and Brownfield? The total contract price, exclusive of any extras, is the sum of $109,523.67.[6] Conner and Brownfield were paid $88,978.12 (P–149), leaving a balance of $20,545.55. In addition, the amendment to the contract of June 27, 1957 (P–3) required Williams and Dunlap to refund to plaintiff the difference between the sum of $10,150 and the actual cost of the framework deleted from plaintiff's contract thereby. The evidence shows (Tr. 1778–1779) that defendant spent $8,364. for the form work; it follows that plaintiff is entitled to a credit of $1,786.

These items total $24,511.99.[7] By what amount is this to be reduced? The burden of proving the legitimate amount required to bring the work into complete compliance is upon Williams and Dunlap. Williams and Dunlap insists that it spent $37,195.05 to complete this subcontract (Tr. 2618; D–58). D–58 forms the only evidentiary basis for this cost and consists of detailed "Foreman's Daily Reports" and payroll. The exhibits were interpreted by Mr. Grossman.

The employees worked on different jobs on the same day and then approximations were made by the foreman or Grossman as to what proportions were chargeable to what sub contract. Sometimes Grossman would make the approximation on his personal observation and sometimes on his past experience. Under these circumstances we do accept D–58 as proof that much work was necessary but not as proof that $37,195.05 was spent to complete the job. The record supports the proposition that the alleged $19,000 of this amount spent after July 8, 1958 for work which defendant itself considered to be unreasonably, unnecessary, and over and above the contract requirements was of such a nature and performance at such a time, that it should not have been done by defendant without *specifically* notifying Conner and Brownfield.[8]

Taking all things into consideration we feel that a finding on this record that Williams and Dunlap should be allowed a credit of $11,704.11 to complete the contract would be fair. We so find. Subtracting this amount from the $24,-511.19 leaves a net balance under the subcontract due Conner and Brownfield of $12,707.08, and for this amount there should be judgment rendered in behalf of Conner and Brownfield and against the defendants. IT IS SO ORDERED. (Incidentally, the figure of $11,704.11 is 10 per cent of the total contract price, plus extras, which under normal circumstances would have been the retainage to correct defects).

## THE $109,523.67 STIPULATION

Illustrative of the problems posed by this litigation is the fact that the par-

6. There is a serious controversy over this but we agree with plaintiff's position (See "The $109,523.67 Stipulation" discussion which will appear later.

7. The Court rejects plaintiff's claim for special damage and also plaintiff's claim for some $3,579.03 for brake stakes and for fabrication of re-enforcing steel.

8. Conner and Brownfield knew specifically the defects and deficiencies through June 12th (See P–366).

ties stipulated on Page 2321 of the transcript as follows:

"* * * it has been agreed by and between counsel that the base contract figure totalling the Conner and Brownfield subcontract for concrete work is $109,523.67."

Plaintiff insists that the stipulated figure was the base contract price after deducting the $10,150 omitted from the contract by the amendment (P–3) of June 27, 1957. Defendant just as vigorously insists that this was the price before the $10,150 deduction. The respective positions on this stipulation are fully set out in the attached letters of the lawyers which are made part of the original opinion and are attached hereto. After serious reflection we concur with plaintiff; concurrence has been reflected in this ruling.

### THE INTERVENTION OF SAM YOUNG

Sam Young was a sub-sub on this project. On or about May 2, 1957 Conner and Brownfield contracted with him in writing (see copy attached to original petition). Young was to do certain work and labor described in the contract for and in consideration of the sum of $25,000.

Young asserts:

(1) Conner and Brownfield failed to honor plaintiff's last draw based on his "progress report" for work done by Young during January, 1958. This amount is $3,008.14.

(2) Conner and Brownfield still holds 10 per cent of Young's contract price, which is the approximate amount of $3,294.61.

(3) Brownfield, acting for the partnership, ordered Young to "pull", or raise, the iron wire or mesh in all of the concrete slabs, and Young agreed to do this at the rate of one cent per square foot, to which Brownfield agreed. This totaled $4,526.48.

(4) Conner and Brownfield maintained their work schedule in such a manner as to cause Young to pay out overtime for his laborers, which overtime amounted to $1,263.73.

(5) Williams and Dunlap borrowed laborers from Young to finish up their separate work for which laborers Young paid $861.68.

The Court specifically finds that: (1) Young has failed to prove any contract with Conner and Brownfield concerning one cent per square foot for pulling the iron wire or mesh; (2) Young has failed to prove any claim against Conner and Brownfield concerning overtime for Young's employees; (3) Young has failed to prove that Williams and Dunlap borrowed Young's employees to finish up separate work, for which work Young paid them.

It is true that under the subcontract Sam Young was owed by Conner and Brownfield some $3,294.61 in retainage and some $3,008.14 as a final progress payment. Conner and Brownfield admits this but of course this admission is hinged on the assumption that his (Young's) work was satisfactory. The record is replete with evidence that it was Mr. Young's work that was so very defective. Mr. Brownfield sent Mr. Young back to the job site to correct these deficiencies. Under Article VIII of the subcontract Young was obligated, at his own cost, to make good any defect in his work and if he failed to so do within a reasonable time after receiving notice, then Conner and Brownfield had the right to make good such work at Young's expense.

Young not only neglected to make good the defects. He went to the job and specifically authorized Williams and Dunlap to complete and charge back.

A complete list of the defects in Mr. Young's work appears in Exhibit P–366. This was reproduced from the Architect's list. We find that the retainage and final estimate of Mr. Young was easily consumed by Williams and Dunlap in correcting these flagrant deficiencies.

The demands of the intervention of Sam Young are rejected.

CIVIL ACTION NO. 7462
CHARLES H. McKERREGHAN
V.
WILLIAMS & DUNLAP, A PART-
NERSHIP, ET AL.

On or about March 18, 1957, C. H. McKerreghan entered into a subcontract with an entity known as Williams, Dunlap and Young. Williams, Dunlap and Young was the utility subcontractor on the 300-unit housing project for England Air Force Base. The status of McKerreghan was that of sub-subcontractor. McKerreghan's obligation under the sub subcontract was:

"to furnish all tools, equipment and labor for the installation of all 2-inch and 4-inch gas mains and 1-inch and 1½-inch gas service lines according to the plans and specifications, and in particular Section 31 of the Specifications; and to furnish all tools, equipment, labor and all materials necessary for the construction of all concrete headwalls and concrete curved inlets as shown on the drawings and described in the specification."

Williams, Dunlap and Young was a joint venture, a partnership entity composed of H. E. Williams, Jr., B. P. Dunlap, and G. G. Young. Williams and Dunlap are the same two persons forming Louisiana partnership of Williams and Dunlap.

The sub-contract appears in the record as D–2.1. The amounts allowable under the contract to McKerreghan for the item completions amounted to $24,889.80.

McKerreghan entered into the performance of his subcontract and continued on the job until the first week of December 1957. At the time he left the project he had completed the installation of the gas mains, the service lines, the concrete headwalls and curved inlets, and all that remained under contract was the testing of the gas mains.

On October 3, 1957, the contracting officer (Captain Max D. Peterson, USAF) wrote a letter to the prime contractor requesting that McKerreghan to be re-placed immediately. This letter which appears in the record as D–12.4 states:

"the majority of the catch basins poured while he was in charge have not been acceptable and in general have been a continual source of agitation to require their correction, of workmanship and defects, to be made."

On October 8th the prime contractor notified Peterson that McKerreghan had not been ordered from the project and that his subcontract had not been taken over, but that he had been prohibited from doing any actual building or supervision in connection with the inlet boxes and catch basins. The prime contractor pointed out that McKerreghan was merely observing the work of an employee of the prime contractor whom Williams and Dunlap had placed on McKerreghan's payroll to supervise this work (D–12.3).

Did McKerreghan abandon the contract? Mr. Young testified that he wrote Mr. McKerreghan a letter and told him to come on in and test his lines and gave him forty-eight hours to do so (Tr. 1373). Mr. Young states that McKerreghan replied (orally) that he was trying to make a living somewhere else and would not have the time to make the tests. Mr. Young added that McKerreghan requested him to get someone else to do it for him. Mr. Grossman says (Tr. 2239) that there was nothing Mr. McKerreghan could do in the way of work or supervision after September because of the contracting officer.

Mr. McKerreghan (Tr. 1853–1854) states that he did everything except test the gas lines, and in answer to an inquiry by the Court, conceded he did not test because "I didn't have the money to stay on and finish the job, I had to go." All agree that the testing would have taken at least ten additional days and probably more. It was an integral part of the job.

 Considering the totality of facts we conclude that McKerreghan did not substantially complete his contract. He abandoned it. He was not permitted

to supervise or do any work as a result of the contracting officer's instructions. He was losing money on the job and had no cash to meet the payroll. He underestimated the job. The fact that he gave out of money was not the responsibility of either the prime contractor or of Williams, Dunlap and Young.

 We find that McKerreghan's performance of his work was mismanaged, very poor, and unacceptable installation was the rule rather than the exception. He did not complete his work, he abandoned. He is not entitled to recover under the contract.

 Assuming arguendo that McKerreghan had substantially completed his contract, we would nevertheless reach the conclusion that Mr. McKerreghan has nothing coming to him. Why? Because under the Louisiana Doctrine of Substantial Compliance, McKerreghan would be entitled to recover his full contract price minus the amount of money necessarily expended to correct deficiencies and to bring the work into compliance. A quick glance at the record will reveal that the total contract price was $24,889.80. McKerreghan was paid directly $19,627.33 (Tr. 2186–2187; D–4(f) 1 through (f) 25). $3,866.47 was paid to others in behalf of McKerreghan. A balance of $1,396 remained due. The records certainly reflect that *this much at least* was necessarily expended in completing the testing of the gas lines and in making fundamental repairs (Tr. 1411–1420; 1324–1325; 2181–2185; 1404–1409). We are quick to add that we are *not* holding that it cost a total of $10,782.19 to complete the subcontract. Defendants themselves, in a pre-trial memorandum, were of the opinion that this cost was $2,200. We make these additional findings:

(a) That Williams, Dunlap and Young did not breach the contract with McKerreghan in any particular.

(b) That McKerreghan's alleged "extra work," if any occurred, arose out of McKerreghan's misjudgment and was not the fault of Williams, Dunlap and Young.

There should be judgment for defendants. IT IS SO ORDERED.

CIVIL ACTION NO. 7542

UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF UNITED INSULATION COMPANY, INC.

V.

WILLIAMS & DUNLAP, A PARTNERSHIP, ET AL.

Thomas P. Simpson is United Insulation Company, a Louisiana corporation domiciled in Rapides Parish, Louisiana. It had the insulation contract on the project, and claims:

(A) Balance due under the subcontract;

(B) Materials furnished on open account to Williams and Dunlap;

(C) Extra labor costs due to lack of coordination of job and failure to furnish other subcontractors materials, thus causing houses not to be available to United Insulation for work in an orderly and economical manner.

## A. BALANCE DUE UNDER THE SUBCONTRACT FOR INSULATION WORK

 The total of United Insulation's subcontract was $36,495. This price was reduced by Mr. Grossman by $1,000 when Mr. Simpson requested permission to use "Reynolds Aluminum Foil" instead of the foil specified. This was an "or equal" item. This reduction was without consideration and cannot stand.

 United Insulation completed its contract. There is no claim to the contrary. That something is owed United Insulation is the one significant agreement between the parties. United Insulation was paid $31,945.50. No defects existed. No defects are even alleged. Defendants are indebted to United Insulation in the amount of $4,549.50.

The Court cannot comprehend why this amount was not paid. It was due when the work of the prime contractor was accepted on July 8, 1958 (Article XII). The failure to pay was arbitrary, capricious, and without probable cause. Reasonable attorney's fees are due United Insulation Company in the amount of $1,500 (LSA–R.S. 22:658).

## B. MATERIALS FURNISHED ON OPEN ACCOUNT TO WILLIAMS AND DUNLAP

■ United Insulation claims to have furnished aluminum foil at the request of Williams and Dunlap in the amount of $1,551.86. The Court finds that this foil which was invoiced to Williams and Dunlap on open account by United Insulation was aluminum foil that United was required to furnish under the terms of its subcontract. It was not extra aluminum foil furnished for the job for which he is entitled to be paid (See testimony of Charles R. Lamkin, Tr. 3099 and 3104, and testimony of Roberts, Tr. 3154–3155).

## C. EXTRA LABOR COSTS DUE TO LACK OF COORDINATION, ETC.

■ United Insulation, prior to this suit, never notified Williams and Dunlap of any extra costs; did not protest or claim any extra costs. Besides, we are persuaded that United Insulation has failed to prove that Mr. Simpson was required to furnish extra labor and/or material at the direction of or because of actions of Williams and Dunlap.

## CONCLUSION

There is judgment in favor of United Insulation Company, Inc. and against defendants, in solido, in the amount of $4,-790.38,[9] plus $1,500 attorney's fees, together with five (5%) per cent interest thereon from July 8, 1958 until paid.[10]

9. This includes $240.88 for truck rental, which item is not disputed, plus the $4,-549.50.

CIVIL ACTION NO. 7627

UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF B. M. JINKS, d/b/a JINKS CONSTRUCTION COMPANY AND B. M. JINKS, d/b/a JINKS CONSTRUCTION COMPANY

V.

WILLIAMS & DUNLAP, A PARTNERSHIP, ET AL.

B. M. Jinks was a resident of Tarrant County, Texas. On or about March 7, 1957 he entered into a contract with Williams and Dunlap to perform portions of the work incident to the construction of the England Air Force Base Housing Project. This subcontract appears in the record as P-5. It is made a part hereof by reference. Pursuant thereto, Jinks was to furnish all

> "material and labor necessary for the performance of all work as described in the Specifications under Section 21, item (b) under Section 2, and removal of water as described under EXCAVATING in Section 2 * * *."

■ ■ At the outset we are confronted with Jinks' contention that at the time this contract was signed a slip of paper was attached thereto excluding driveways, patios, sidewalks and fine grading. Jinks so testified. There is no corroboration. The slip of paper is missing. Grossman says it never existed. Evidence to show the existence of such a piece of paper and its contents is perfectly proper, but on the record plaintiff has not carried his burden of proving the modification of the contract. We agree with defendants that Jinks was obligated to do all grading and filling and excavation work on the project, and that there are no exclusions of any kind from this work that included compaction of all subgrade for all structures, including

10. Article 1938 of the LSA–Civil Code provides: "All debts shall bear interest at the rate of five per centum per annum from the time they become due, unless otherwise stipulated."

houses, streets, sidewalks, driveways, patios, carports, etc. Jinks was *not* required to do the "fine grading."

Shortly after the execution of the initial contract there arose a controversy between Williams and Dunlap and the Air Force with reference to who was to furnish, spread, and compact fill necessary to bring the mortgage site up to grade. This controversy resulted in a decision of the contracting officer adverse to Williams and Dunlap to the effect that the off-site contractor would not be required to bring on to the mortgaged area excess fill material, nor would the off-site contractor be required to spread and compact this material. It was because of this decision that a supplementary subcontract was entered into between Jinks and Williams and Dunlap. This contract appears in the record as P-6. It is made a part hereof by reference. It required Jinks to compact and grade the south end of the project.

In early September, because of extra expenses and adverse conditions under which he had been forced to work because of the (a) failure of the prime contractor to have the site prepared to receive Jinks' work and (b) the failure of Williams and Dunlap to bring the necessary fill material on the job and (c) the failure to fully engineer the site. Jinks ran out of money and could neither meet his payrolls nor repair his equipment. On or about September 7th Jinks and Williams met in Dallas. There it was agreed that Williams and Dunlap would advance Jinks money for his payroll and repair. Jinks agreed to continue supervising the work until its completion. *Williams suggested to Jinks at this time that it would take only about $4,000 to complete the contract.* Some two weeks after this agreement, and at a time when the necessary fill material still had not been furnished, Mr. Williams called Mr. Jinks into his office and advised him that he, Mr. Williams, was tired of "messing" with him and that

he was going to take over his contract. He told Jinks that he would receive a letter to that effect. This notice was received on or about September 26th. It appears in the record as P-149-A. Jinks was thus advised:

> "Due to your evident lack of interest and lack of application of your time and energies to the completion of this job, we are invoking Article 24 of your contract. Under the terms of the aforementioned article, we are giving you 48 hours' notice that we are taking over your contract and turning it over to the bonding company for completion [11]."

Significantly, this notice of termination does not request Jinks do anything but just tells him that his contract is terminated. The notice further barred Jinks from coming on the project and ordered him to make no contact with anybody on the project, save and except the representatives of Williams and Dunlap. Later when he did come on the job to get material, he was arrested and taken into custody. Significant, too, is D-16-A (a yellow bookkeeping sheet purporting to be some kind of listing or tabulation of Jinks' account). There appears on the reverse side of that instrument a note in the handwriting of Mr. Williams which reads:

> "It looks like the best route to follow is to keep the cat and scraper until September 21 (this will finish (finish) the streets and use it until this date on the flatwork.)

> "After the 21st of September, turn back the cat and scraper and then use the AC5-DC6 and the WDY and Jinks maintainers to do all the work. Also Jinks has an HD10. Also Jinks has a Gallion 102, 1950 model that will take about $200 work done. Need a spliene-rear end and pinion. "It appears that it will be best for W & D. to write Jinks a letter and take over-leaving Blackie or J. Dement in charge."

11. They did *not* turn it over to the bonding company.

Indisputably, plaintiff is correct in stating that "it is apparent that at the same time Mr. Williams was agreeing to help Mr. Jinks out of his financial difficulties in Dallas, he was at the same time making plans to eliminate Jinks and take his equipment."

We find as a fact that Williams and Dunlap's termination of its contract with Jinks on or about September 25th was arbitrary and without cause or justification, and constituted a breach of contract.

We find as a fact that the basic disruption of Jinks' contract was the failure of the off-site contractor to timely construct the system of ditches and pipes called for in the "OFF–SITE" contract into which all "ON–SITE" drainage fed. This tremendously handicapped Jinks in his endeavor to perform that part of his contract requiring "removal of water" as described under EXCAVATING in Section 2. This is the reason Jinks was required to move dirt from one end of the project to the other to keep men working with machinery pushing mud and water around on the mortgage area when doing so was contributing nothing to the progress of the work. Certainly it was Jinks' job to drain work areas, but the failure of the "OFF SITE" contractor to perform timely his drainage operations made the "ON SITE" drainage of this "saucer-like" area almost impossible. (See P–358).

Williams and Dunlap has submitted a claim to the government (P–358) which includes the claim of Jinks. It may well be that in the final analysis the loss in good conscience should be borne by the government. But that is no issue here, and Williams and Dunlap cannot avoid its responsibility in this connection on the ground that the failure to furnish a proper site was the fault of another (Ardmore Concrete Material Company, etc. v. Williams et al., 1957, 10 Cir., 240 F.2d 561; Fanderlik-Locke Company et al. v. United States for Use of M. B. Morgan, 1960, 10 Cir., 285 F.2d 939).

We also find that it was most difficult for Jinks to grade the lots for the area as a whole until the fill material had been brought in so as to permit the lots to be built up to grade. This, too, may have been the responsibility of the "OFF SITE" contractor, and in the final analysis the fault of the government, but here again it is neither just, right, nor legal to permit Williams and Dunlap to escape its obligation to have this material ready.

We find also that insofar as Jinks is concerned, engineering was not furnished him. This created considerable hardship and difficulty in cutting the streets and resulted in extra costs to Mr. Jinks. In some instances Jinks would build a house pad in one place, and then after a delay it would be decided that the streets were some place else.

Williams and Dunlap breached the subcontract with Jinks in:

(1) Failing to prepare the site to receive the work of Jinks.

(2) Failing to provide the necessary engineering to Jinks at the time and place needed.

(3) Failing to furnish fill material at the time and in the quantities needed.

As a result of these breaches, Jinks, who had come on this job with cash in the bank, found himself penniless and with equipment terribly depreciated.

## DAMAGE

Article 1934 of the LSA–Civil Code provides:

"The damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived."

*The evidence here does not reveal whether Jinks would have made an actual profit over and above expenditures on his subcontracts.* He had the burden of proving profits. He has failed in that burden. We reiterate that Jinks might have recovered profits if he had proven any *true,* as distinguished from *speculative,* profits would have been rea-

lized, but this he failed to do. We shall restrict our award to an amount equal to the remainder after subtracting the amount received by him from the total of his expenditures attributable directly to the subcontracts.[12]

Clearly applicable here are these words of the Supreme Court of the United States:

"Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the [appellant] should have proven this fact. It will not be presumed. * * *

"The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. * * * It does not lie, however, in the mouth of the party, who has voluntarily and wrongfully put an end to the contract, to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend, (including his own services), after making allowance for the value of materials on hand; at least it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract." United States v. Behan, 1884, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168.

12. United States v. Behan, 1884, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168; Soby v. Johnson, 1959, 9 Cir., 270 F.2d 193; Burstein v. United States, 1956, 8 Cir., 232 F.2d 19; Riley v. Capital Airlines,

We find that Jinks spent $40,345.23 [13] in cash and in addition owed taxes and insurance chargeable to the job in the amount of $7,551.56. This totals $47,-896.79. The checks, bills, etc. supporting this figure appear in the record as Exhibit D–37. On the adding machine tape (P–331) charges of $775.00, $516.-50 and $1,000 are not supported by checks or bills. In addition, we find that cash disbursements totaling $1,330.29 were not properly attributable to this subcontract. Deducting these amounts from $47,896.79 leaves a total of $44,275.35. Jinks has proven by a preponderance of the evidence that expenses in that amount were incurred by him in performance of his subcontracts. Williams and Dunlap paid to or for Jinks $30,400.99. The difference is $13,874.36 and plaintiff is entitled to be reimbursed.

The record reveals that Williams and Dunlap took possession of four (4) major pieces of equipment belonging to Jinks. This equipment was taken over on or about September 26, 1957, pursuant to Williams and Dunlap's letter of termination dated September 25, 1957 (P–149–A).

 Having previously found that this termination was arbitrary and without justification, it necessarily follows that Williams and Dunlap had no right to take over Jinks' equipment. One of these pieces of equipment was a grader (original new cost, $15,000) valued by Jinks at $4,500. Another was a large "dozer" (original new cost, $27,000) valued by Jinks at $8,000. The third was a small "dozer" (original new cost, $15,000) valued by Jinks at $2,000. The fourth piece of equipment was a motor grader valued at $2,000 by Jinks. The evidence will support a finding and we find that this equipment was damaged through neglect and misuse over and above normal wear and tear during the

1960, D.C.Ala., 185 F.Supp. 165; Alexander H. Kerr & Co. v. Fooks, D.C. Ark., 1956, 145 F.Supp. 503.

13. Tr. 225; P–331.

five-month period it was retained by Williams and Dunlap. We find that it was so damaged in the amount of $2,000.

Counsel for Jinks vigorously argues that he is certainly entitled to an additional allowance against Williams and Dunlap "for the value of the use of his equipment for the six-months' period after Mr. Jinks left the job." This may be true, but we would require more persuasive evidence of these rental values before making any award for such use. We find the record does not suffice to show any basis for an award for rental value. Jinks' demands in this category must be rejected.

■ There should be and there is judgment in favor of plaintiff and against defendant, in solido, in the amount of $15,874.36, together with interest thereon from September 27, 1957 (the date of Jinks' unlawful termination) until paid.

CIVIL ACTION NO. 7628

UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF P. L. FEARS, d/b/a P. L. FEARS TILE COMPANY AND P. L. FEARS, d/b/a P. L. FEARS TILE COMPANY, INDIVIDUALLY
V.
WILLIAMS & DUNLAP, A PARTNERSHIP, ET AL.

■ P. L. Fears was 46 years of age at the time of this trial. He had been in the construction business for ten years. He was formerly a senior engineer with E. I. Dupont Company. He had engaged in the general construction business in one phase or another since the age of 18. His contract was signed on March 18, 1957. He was a subcontractor to furnish material and labor necessary for the ceramic tile work. The contract included furnishing and installing all bath accessories, access panels, shower curtain rods and shower curtains. Plaintiff alleges that Williams and Dunlap, the prime contractor, breached in the following particulars:

(1) In failing and refusing to pay plaintiff the monthly progress payments as provided for.

(2) In failing and refusing to coordinate the work of the various building trades which were engaged in the construction of the buildings in question so that plaintiff was compelled to move different groups of workmen from one job to another and from one building to another, so that it was impossible for plaintiff to proceed with the performance of his subcontract in an economical and orderly fashion as was contemplated by this subcontract.

(3) In that Williams and Dunlap failed to plan the construction work so as to make it possible for plaintiff to perform his subcontract in a normal manner.

(4) In increasing plaintiff's cost as a result of these actions.

The Court does feel that Fears was delayed and interfered with to some extent in the performance of his work in that he was forced to install tile at times when the buildings were not ready for such installation. However, under the total circumstances, I am persuaded that plaintiff has not proven damages or breach in the particulars above enumerated.

■ The Court does find as a fact that Fears substantially completed his contract. The Court does find that his contract was completed with the exception of four bathrooms that were not ready for tile and a number of bathrooms that required replacement tile (about 150 pieces). The Court does find that Williams and Dunlap did breach the contract when it changed the locks on Fears' supply house and took over this job on Monday, March 24, 1958.

THE LOCK–OUT AND TAKEOVER OF MARCH 24, 1958

By mid-March, 1958, the tile contract was complete with the exception of four bathrooms and the replacement of some tile and trim pieces that had been broken off after installation. The four bath-

rooms were not ready for the installation of tile and Fears left a man on the job and sent for the necessary tiles to replace the broken title and trim pieces. On Friday, March 21st, Williams and Dunlap, acting through their attorneys, wrote Fears giving him notice to fully man the job within 48 hours. He was notified in this letter that his failure to man the job within 48 hours would result in Williams and Dunlap removing him from the job. This letter was not received by Fears until Monday, March 24th. Fears then, upon investigation, found that Williams and Dunlap had changed the lock on the door of his supply room and had placed another lock on it to which only Williams and Dunlap had the key, and that Williams and Dunlap had already manned the job with tile setters of their own. The taking over of the job by Williams and Dunlap under these circumstances constituted at least a "technical" breach of the contract. Certainly, the 48-hour notice provision was not effective until that notice was received. We have used the word "technical" because we do think Fears had "had enough" and more or less acquiesced in this takeover.

## SUBSTANTIAL COMPLIANCE

Considering the extent of the performance, the degree to which the purpose of the contract had been effected, and the benefit to Williams and Dunlap, together with all other factors, we have held—and reiterate our holding—that the contract had been substantially complied with on the date of this breach of March 24th (Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880.)

The total amount of Fears' contract was $93,819. Payment was made in the amount of $80,279.20. For complete performance he should have received $13,540.39.

■■ Williams and Dunlap claims that it cost them some $24,558.67 to complete the contract. The "takeover" under Article XXIV, if properly executed on requisite notice, would have authorized Williams and Dunlap to make proven charge backs, but proper notice was not given because Williams and Dunlap took over on the same day that notice was received. Then, too, under Article VIII (see Conner and Brownfield) the prime contractor had the right to make good any defects, should the subcontractor neglect to do so after receiving notice. Here, however, after March 24th no notice of any kind was given Fears and neither he nor any representative of his was given the privilege of remedying any defects. Accordingly, the Court holds that Williams and Dunlap's charge backs must fall. The Court again hastens to add that it does not find that these charge backs in this amount are attributable to the Fears work. On the contrary, a careful examination of the transcript and D–59 convinces us that defendant has failed to prove $24,558.65 was expended in charge backs. On May 21, 1958 Williams and Dunlap certified this work for 100% payment and yet D–59 reveals some $3,500 charged to this work subsequent to that date. Fears said $1,100 would have been more than adequate for completion. Mr. Fears' original estimate for labor cost on the whole job was $18,828. Now Williams and Dunlap says the *labor* to complete amounted to $20,399.

On the basis of all the evidence, we conclude that Fears is entitled to the full $13,540.39, minus the amount required to bring the subcontract in complete compliance, which amount we find to be $6,000. As a result of substantial performance, he is therefore entitled to judgment in the amount of $7,540.39, together with legal interest thereon from July 8, 1958 (the date of final acceptance).

■ There remains the claim for $880.30 for material confiscated on the job. Grossman says he did not see any such equipment. Fears said it was there when Williams and Dunlap took over. Fears made no demand for the return of this equipment. The record does not reveal what happened to it. Plaintiff has failed in its burden to prove confiscation of this property by Williams and Dunlap.

Fears' inaction concerning it is persuasive.

## CONCLUSION

There is judgment in favor of plaintiff and against defendants, in solido, in the amount of $7,540.39, together with five per cent interest thereon from July 8, 1958.

Judgment is this day rendered as follows:

Civil Action 7228—in favor of R. L. Autrey and A. L. Goad, d/b/a Autrey and Goad Construction Company, and against all defendants, in solido, in the full sum of $26,937.33, together with legal interest thereon from July 8, 1958 until paid.

Civil Action 7233—in favor of H. E. Luther and against all defendants, in solido, in the full sum of $1,500 together with legal interest thereon from December 23, 1957.

Civil Action 7235—in favor of Conner and Brownfield and against all defendants, in solido, in the full sum of $12,707.08, together with legal interest thereon from July 8, 1958 until paid. The demands of Sam Young, Intervenor, are rejected.

Civil Action 7462—in favor of all defendants and against C. H. McKerreghan, rejecting all demands of the said C. H. McKerreghan.

Civil Action 7542—in favor of United Insulation Company and against all defendants, in solido, in the full sum of $4,790.38, together with $1,500 additionally as reasonable attorney's fees, together with legal interest thereon from July 8, 1958 until paid.

Civil Action 7627—in favor of B. M. Jinks and against all defendants, in solido, in the full sum of $15,874.36, together with legal interest thereon from September 27, 1957 until paid.

Civil Action 7628—in favor of P. L. Fears and against all defendants, in solido, in the full sum of $7,540.39, together with legal interest thereon from July 8, 1958 until paid.