KESK, INC.

v.

The NATIONAL UNION INDEMNITY COMPANY.

UNITED STATES of America for the Use and Benefit of INTERSTATE ELECTRIC COMPANY

v.

KESK, INC., United States Fidelity & Guaranty Company, National Union Indemnity Company of Pittsburgh, Pennsylvania, and Mojave Electric Company, Inc.

GENERAL ELECTRIC COMPANY

v.

KESK, INC., United States Fidelity & Guaranty Company, National Union Indemnity Company, Mojave Electric Company, Inc., Irving Sulmeyer, Trustee in Bankruptcy of Mojave Electric Company, Inc.

WESTINGHOUSE ELECTRIC CORPORATION

v.

KESK, INC., and United States Fidelity & Guaranty Company,

NATIONAL UNION INDEMNITY COMPANY, Third-Party Defendant.

Civ. A. Nos. 8149, 8188, 8224, 8197.

United States District Court
W. D. Louisiana,
Shreveport Division.

Dec. 20, 1963.

Charles D. Egan, Cook, Clark, Egan, Yancey & King, Shreveport, La., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Kesk, Inc., and U. S. Fidelity & Guaranty Co.

A. Morgan Brian, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for National Union Indemnity Co. of Pittsburgh, Pa.

BEN C. DAWKINS, Jr., Chief Judge.

These suits began as actions by suppliers against the principal contractor, and its surety, on a Capehart housing project, for failure of a subcontractor to pay for materials furnished and used in the project. Summary judgments were granted in favor of the original complainants in cases numbered 8149, 8188, and 8224, against the prime contractor Kesk, Inc. Cross-claims and a third party demand were filed in these three cases against National Union, surety for Mojave, the subcontractor, by Kesk and USF&G, its surety.[1] The fourth case, number 8197, is a direct action by Kesk against National Union. The cases were consolidated since in each indemnity is sought from National Union.

The basic facts are that on March 9, 1959, the United States, acting through the Department of the Army and under the authority of the Capehart Act, 42 U.S.C. § 1594 et seq., executed a contract with Kesk and Bossier Base Development Co., Inc., a so-called mortgagor-builder. By this contract, Kesk undertook to furnish all labor, materials and equipment necessary to construct two hundred (200) Capehart permanent family housing units at Bossier Base, Louisiana, under Contract No. DA–03–050–eng–3441, FHA Project No. 059–81015 Army No. 4. Kesk previously had caused the mortgagor-builder to be in-

---

1. For brevity the parties will be referred to in this opinion as follows: Kesk, Inc.—"Kesk"; United States Fidelity and Guaranty Co.—"USF&G"; National Union Indemnity Company—"National Union"; Mojave Electric Company—"Mojave."

corporated, all of its stock being placed in escrow with a private lending mortgagee. Provision was made for transferring the entire stock to the Government upon completion of the project.

This procedure for establishing a mortgagor-builder corporation is essentially a device for obtaining private capital to finance government military housing projects. Private lenders are protected since such projects are FHA insured under provisions of the Armed Services Housing Mortgage Insurance Act, 12 U.S.C. § 1748 et seq. Contemporaneously with the execution of the housing contract the Government leased the land upon which the houses were to be built to the mortgagor-builder. Rentals later to be received from persons occupying the houses were to be paid upon the indebtedness due the lending mortgagee, and upon its payment in full, the mortgagor-builder was to be dissolved, with title to the houses passing to the Government.

As the prime contractor, Kesk was required to give a payment and performance bond, which it did with USF&G as surety. For its own protection, Kesk, in turn, required a conventional suretyship bond from its electrical subcontractor, Mojave Electric Company. Mojave defaulted on the contract in early 1960, and bankruptcy soon followed. Kesk immediately notified National Union, Mojave's surety, that Kesk would hold National Union responsible for any loss and demanded that it take steps to fulfill its suretyship obligations. National Union denied all responsibility upon the ground that it was released by reason of allegedly premature payments made to Mojave by Kesk in violation of the subcontract agreement.

There is but one primary question to be decided: Did Kesk make premature payments to Mojave, and, if so, was National Union thereby released?

The parties agree that solution of this question lies in a correct interpretation of the subcontract between Kesk and Mojave. Kesk contends that it had a duty to make progress payments on account to Mojave for 90% of the work completed and inventory on the job site. National Union argues that Kesk was obligated to make payments only for work completed and materials in place, and that payments for inventory were premature. Each relies upon typed provisions in Section 4 of the subcontract, pertinent portions of which provide:

" * * * The Subcontractor shall submit a requisition for payment five (5) days in advance of Contractor's requisition to the Owners. Contractor shall pay to Subcontractor an amount equal to 90% of *all work completed and in place* (less any work rejected by Contractor or Owner) except that no claim for payment shall be made by Subcontractor which is in excess of the amount approved by the Owners for payment by the Owners to the Contractor.

"Contractor shall pay to the Subcontractor the total of approved requisitions for *work completed and inventory on job site* within five (5) days of receipt of receipt [*sic*] of Contractor's payment from the Owners." (Emphasis added.)

■ Accepted rules of contract interpretation will resolve the superficial conflict between the provisions quoted above.[2] Wherever possible, if consistent with the intention of the parties and the general purpose of the agreement, a construction which gives effect to all provisions of the contract should be adopted.[3]

In the first paragraph quoted above it is clearly provided that payment shall be made for all work completed. The second paragraph just as plainly states that payment shall be made for work completed *and* for inventory on the job site.

2. Cf. LSA–Civil Code Article 1945–1962.

3. Id. Art. 1951; American Manufacturing Corp. v. National Union Fire Ins. Co., 203 La. 515, 14 So.2d 430 (1943); Gau-treaux v. Harang, 190 La. 1060, 183 So. 349 (1938); Glassell v. Richardson Oil Co., 150 La. 999, 91 So. 431 (1922); Green v. Southern Furniture Co., 94 So. 2d 508 (La.App.1957).

Any inference from the first that payment is to be *only* for work completed is negated by the second paragraph. Effect can be given to both by applying the broader provisions of the second. This is the interpretation placed upon the agreement by the parties, Kesk and Mojave.[4]

The reasonableness of this interpretation also is emphasized by the fact that Kesk, under its prime contract, received payment for inventory.[5] The composition of this inventory for which Kesk was paid included inventory belonging to subcontractors as well as Kesk's own inventory. That the parties intended to provide for a portion of this payment to be turned over to subcontractors for their share of the inventory seems reasonably to follow.

■ ■ National Union relies upon the principle that ambiguous provisions in a contract should be resolved against the drafter, in this case, Kesk. However, this rule of interpretation is one of last resort, not to be utilized when the intent of the parties otherwise can be discerned.[6] We thus conclude that the quoted provisions of Section 4 of the subcontract required Kesk to pay both for work completed and for inventory on the job site.

An alternative and rather tenuous defense urged by National Union is that Article 24 of the 1958 AIA General Conditions[7] applies to the Mojave subcontract. The subcontract was written on an AIA standard form for subcontracts which contained the statement: "For Use in Connection with the Sixth Edition of the Standard Form of Agreement and General Conditions of the Contract." The Sixth Edition was the 1951 version, and its Article 24 does not support National Union's contention.[8]

---

4. Beginning with the very first draw, Mojave listed inventory as an item for which it should be paid, and Kesk included it in determining the amount of payment on account to be made.

   "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation." LSA–Civil Code Art. 1956. Baird v. United States, 3 F.Supp. 947 (W.D.La.1933), aff. 65 F.2d 911, cert. den. 290 U.S. 690, 54 S.Ct. 126, 78 L.Ed. 594 (1933); Simmons v. Hanson, 228 La. 440, 82 So.2d 757 (1955); Pendleton v. McFarlane, 222 La. 569, 63 So.2d 1 (1953); Book v. Schoonmaker, 210 La. 94, 26 So.2d 366 (1946).

5. The prime contract provided in Article IV, section (7):

   "* * * The sum to which the eligible builder shall be entitled upon any such payment shall be the total of the purchase price or the estimated cost, whichever is less, of uninstalled acceptable materials suitably stored on the mortgaged property in a manner acceptable to the contracting officer, plus the cost of the portions of the work acceptably completed * * *."

6. 17A C.J.S. Contracts § 324.

7. The full title of the document prepared by the American Institute of Architects is "The General Conditions of the Contract for the Construction of Buildings." Article 24 of the 1958 AIA General Conditions provides in pertinent part:

   "* * * If payments are made on account of materials not incorporated in the work but delivered and suitably stored at the site, or at some other location agreed upon submission by the Contractor of bills of sale or such other procedure as will establish the Owner's title to such material or otherwise adequately protect the Owner's interest including applicable insurance."

8. The pertinent portion of Article 24 of the Sixth Edition of the AIA General Conditions provided:

   "If payments are made on account of materials delivered and suitably stored at the site but not incorporated in the work, they shall, *if required by the Architect*, be conditioned upon submission by the Contractor of bills of sale or such other procedure as will establish the Owner's title to such materials or otherwise adequately protect the Owner's interest." (Emphasis added.)

   The architect testified that he never required the submission of bills of sale or established any other procedures for determining who had title to materials stored on the job site. He did indicate, however, that there was an unusual division of authority between architects and the Corps of Engineers on a Government

A further effort to escape this result is made by argument that since the subcontract was written after 1958 the parties must have had reference to the newer 1958 General Conditions, even though the subcontract used expressly specified the Sixth Edition (1951 version).

Section 1 of the subcontract states:

"The Subcontractor agrees to furnish all material and perform all work as described in Section 2 hereof for FHA Project No. 059–81015– Army No. 4 and ENG. Serial No. ENG–03–050–59–27 — 200 Capehart Permanent Housing Units for U. S. Army Engineer District, Little Rock [,] Little Rock, Arkansas hereinafter called the Owner, at Bossier Base, Shreveport, Louisiana in accordance with The General Conditions of the Contract between the Owner and the Contractor and in accordance with the drawings and Specifications prepared by Van Os and Flaxman hereinafter called the Architect, all of which General Conditions, Drawings and Specifications signed by the parties thereto or identified by the Architect, form a part of a contract between the Contractor and the Owner dated, March 9 1959, and hereby become a part of this Contract."

All subsequent references to General Conditions clearly were intended to refer to provisions of the prime contract specified in Section 1. The prime contract was not even written on an AIA Standard Form. In subcontract sections 5(b) and (e), dealing, respectively, with applications for payment by the subcontractor,

and payments by the contractor, where references were made to Article 24 of the General Conditions, "Article 24" was specifically deleted. Two other provisions of the subcontract which were not deleted have significance only if reference is made to the AIA General Conditions.[9] National Union contends that in order to give these provisions meaning it must be held that the AIA General Conditions constitute a part of the subcontract.

As noted, however, the very article which National Union wants applied, Article 24 of the 1958 AIA General Conditions, was specially and deliberately deleted at every place where it appeared in the subcontract. According to Section 1 of the subcontract, the General Conditions to which the subcontract has reference are those that are made a part of the prime contract and are signed by the parties thereto or identified by the architect. The parties to the prime contract did not sign the AIA General Conditions nor did the architect identify them as part of the prime contract.

The major portion of the subcontract is typed; but the provisions upon which National Union relies are part of the printed form. It is far more reasonable to conclude that the parties inadvertently failed to delete certain nonessential references, such as Sections 5 (j) and (n), than that the parties intended to incorporate into the subcontract a whole new contract not signed or identified as required by Section 1 of the subcontract. That a subcontract form is designed for use with a particular prime contract form does not thereby render that prime contract form a part

---

contract such as this; but there was no evidence to show that the Corps of Engineers required any proof of title for materials on the job site.

9. Printed portions of Section 5 of the subcontract provide:

"&ast; &ast; &ast; The Contractor agrees—
&ast; &ast; &ast;

"(1) To pay the Subcontractor a just share of any fire insurance money received by him, the Contractor, under Article 29 of the General Conditions.
&ast; &ast; &ast;

"(n) To name as arbitrator under arbitration proceeding as provided in the General Conditions the person
&ast; &ast; &ast;"

Although there is a paragraph 29 in the prime contract, it does not apply to fire insurance. Article 29 of the AIA General Conditions does cover the subject of fire insurance. The prime contract does not mention arbitration, but the AIA form for such contracts does. From this National Union argues that the parties must have intended for the AIA General Conditions to be part of the subcontract.

of the subcontract. Here the conclusion is inescapable that the intention of the parties to the subcontract was that the General Provisions of the actual contract between the government and Kesk would apply, not those of the AIA General Conditions.

We adhere to the principle that, in interpreting an agreement, meaning should be given to all provisions of a contract, if possible. Nevertheless, since we are bound to give legal effect to contracts according to the true intent of the parties,[10] it is, we believe, a far sounder method of construction to disregard insignificant provisions not relevant to the main thrust of the contract than to distort the entire contract by giving controlling meaning to inconsequentialities. We thus find that the parties did not intend for Article 24 of the 1958 AIA General Conditions to be applicable to their subcontract. Accordingly, we hold that the payments by Kesk to Mojave for inventory on site were not premature, were required, and do not release National Union from its suretyship agreement.

The quantum of recovery to be allowed involves several subsidiary issues. Kesk seeks reimbursement of judgments rendered against it in favor of companies which had furnished materials to Mojave and not been paid. The judgments paid by Kesk and other claims by it are as follows:

(1) Judgment in favor of Interstate Electric Company of Shreveport: $666.34, plus legal interest from June 7, 1961.

(2) Judgment in favor of Westinghouse Electric Corporation: $76,680.16, plus legal interest from July 30, 1962.

(3) Judgment in favor of Interstate Electric Company: $4,193.38 plus legal interest from February 6, 1961.

(4) Judgment in favor of General Electric Company: $3,458.71, plus legal interest from February 21, 1961.

(5) Claim for premiums paid to obtain lien-release bonds filed on August 25, 1961: $3600.00 plus legal interest from September 12, 1962.

(6) Penalty of 12% on the Aggregate of the above amounts under the provisions of LSA–R.S. 22:-658.

(7) a) Attorney fees in the sum of $12,000.00 under the provisions of LSA–R.S. 22:658.

b) Alternatively, attorney fees of 10% of recovery under the provisions of LSA–R.S. 9:-3902.

(8) All costs of Kesk and USF&G in these consolidated proceedings.

Kesk admits the above claims are subject to a credit of $2,-957.70.

■ Since National Union was not released from its suretyship agreement, it must, under that agreement, reimburse Kesk for the damages resulting from Mojave's default. Clearly, Kesk is entitled to reimbursement for claims (1) through (4), the amounts paid to satisfy judgments in favor of Mojave's materialmen.

When Mojave failed to pay for materials furnished by Westinghouse Electric Corporation and General Electric Company, they filed liens against the lease to Bossier Base Development Co., Inc., of the property upon which the Capehart housing was constructed. Kesk notified National Union of this and demanded that it take steps to remove the liens immediately. National Union replied that it considered the liens to be against United States property, and, as such, invalid, and took no further steps to obtain their release. In order to obtain final payment for completion of the prime contract,[11] Kesk was forced to obtain release of the liens by paying $3600 for

10. LSA–Civil Code Article 1945.

11. Article 14(d):
"(d) Upon completion and acceptance of all work required hereunder, the amounts

release bonds guaranteeing payment of the claims asserted in the liens.

■ In such circumstances, Kesk had the duty of taking reasonable steps to minimize damages which might result from recordation of the liens. Under analogous circumstances, a Louisiana court has held that even the bonding of an unlawful attachment may be required if this will mitigate damages.[12] Under the prime contract the mortgagor-builder was to withhold 10% of the amount due until 30 days after completion or until the legal period allowed for filing of liens by materialmen and laborers had expired. The contract also provided that upon completion and acceptance of the work, Kesk was to furnish the government and the mortgagor-builder a general release, if required, of all such claims. Thus it is clear that Kesk would not have been paid more than $300,000.00 (10% of the total contract price of $3,142,500.00) until all liens were satisfied. National Union's failure to fulfill its suretyship obligation required expenditure by Kesk of $3600.00 for lien release bonds; an expenditure which was reasonably calculated to minimize damages and for which Kesk is entitled to reimbursement.

■ The amounts claimed in (6) and (7) (a) must be denied. Even if LSA-R.S. 22:658 is not superseded by LSA-R.S. 9:3902 (as we believe it to be) in so far as claims for attorney fees and damages against a surety are concerned,[13] under the circumstances here the refusal of National Union to pay the amount claimed was not "[A]rbitrary, capricious, or without probable cause" as required by LSA-R.S. 22:658 as a prerequisite for assessment of damages and attorney fees.

■ When a surety on a bond fails to pay his obligation, a creditor who is forced to sue thereon is entitled to an additional ten per cent of the amount recovered as attorney fees under the provisions of LSA-R.S. 9:3902. National Union admits that this statute applies but emphatically denies that the requirements of the statute have been met. Primarily it urges that there can be no assessment of attorney fees unless Kesk recovers in this action the full amount which it demanded prior to suit. If a creditor demands more than that to which it is entitled, then it clearly cannot collect attorney fees in a subsequent action in which it recovers less than it demanded.[14] However, except for *dicta* in one case,[15] the cited cases do not indicate that the amount collected must be the exact amount demanded.[16] What

---

due the eligible builder under this Housing Contract from mortgage proceeds will be paid by the mortgagor-builder. Final amounts shall be payable after the eligible builder shall have furnished the mortgagor-builder and the Department with a release, if required, of all claims against the Department and/or the mortgagor-builder arising under and by virtue of this Housing Contract, other than such claims, if any, as may be specifically excepted by the eligible builder from the operation of the release in amounts stated therein. All payments shall be subject to reduction for overpayments and increase for underpayments on preceding payments to the eligible builder. Any overpayments to the eligible builder shall, unless otherwise adjusted, be repaid upon demand."

12. Cailleteau v. Bordelon, 39 So.2d 117 (La.App.1949). Cf. Younger Bros., Inc. v. Spell, 194 La. 16, 193 So. 354 (1940);

6 Am.Jur.2d, Attachment and Garnishment § 524.

13. Another member of this Court, in Autrey v. Williams & Dunlap, 210 F.Supp. 491 (W.D.La.1962) in a similar situation applied both LSA-R.S. 22:658 and LSA-R.S. 9:3902.

14. Autrey v. Williams & Dunlap, 210 F. Supp. 491 (W.D.La.1962); Townsend v. Atterberry, 171 La. 885, 132 So. 411 (1931); Gas Appliance Co. v. Hamlin Homes, Inc., 147 So.2d 228 (La.App. 1962); Kozlowski v. Fowler, 71 So.2d 246 (La.App.1954); Central Lumber Co. v. American Employers' Insurance Co., 15 So.2d 229 (La.App.1943); Folse v. Maryland Casualty Co., 193 So. 385 (La.App. 1940).

15. Central Lumber Co. v. American Employers' Insurance Co., 15 So.2d 229 (La.App.1943).

16. Cf. Columbus Rock Co. v. Alabama General Ins. Co., 153 F.Supp. 827, 832 (M.D. Ala.1957).

they hold and what the statute requires is that the *full* amount demanded be recovered. The reason for this is that if a creditor demands less than that to which he is entitled the debtor should pay him, but not if the demand is greater than the debt.

Kesk made repeated demands upon National Union to fulfill its obligation. Mojave had informed Kesk that it would be unable to complete the contract, and it subsequently developed that Mojave was insolvent. National Union was aware of these developments. Nevertheless, it argues that it should not be assessed for attorney fees since a thirty-day demand prior to suit was not made on Mojave. Under the circumstances, such a demand would have been a vain and useless act, and as such was not required,[17] because National Union had denied all liability from the beginning. Kesk is entitled to an award of attorney fees in an amount equal to ten per cent (10%) of the amount recovered. All taxable costs, of course, are to be assessed against National Union.

One remaining question to be resolved is the amount of credit due as a result of the fact that Kesk's total payments to Mojave and Carter[18] were less than the original subcontract price, as amended. On this issue a witness for Kesk testified that a credit of $2,957.70 was due, but the itemized list of draws by Mojave amount to $93,899.83; there were terminal expenses amounting to $3,496.70; and the total payment to Carter for completing the electrical work was $80,012.65; for a total of $177,409.18. The original subcontract price agreed upon with Mojave, as amended, was $180,710.00 making a difference of $3,300.82. This variance between the itemized figures and the credit admitted to be due, in the absence of some plausible explanation, must be resolved against Kesk, which bears the burden of proof; and National Union is entitled to credit for the difference.

A proper decree should be presented.

---

17. Cf. Sbisa v. American Equitable Assurance Company, 202 La. 196, 11 So.2d 527, 534, 145 A.L.R. 332 (1942); Mayes v. State Farm Mutual Automobile Insurance Co., 141 So.2d 890 (La.App. 1962).

18. Carter Electric Company (Carter) was selected to complete the work begun by Mojave.